# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2020-DP-00440-SCT

*WILLIE CORY GODBOLT*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/28/2020 |
| TRIAL JUDGE: | HON. DAVID H. STRONG, JR. |
| TRIAL COURT ATTORNEYS: | ALISON R. STEINER |
| | KATHERINE ELIZABETH POOR |
| | M.A. BASS, JR. |
| | ROBERT W. BYRD |
| | RODNEY GLEN TIDWELL |
| | WILLIAM BRENDON ADAMS |
| | JASON E. TATE |
| | GUS GRABLE SERMOS |
| | W. BRADY KELLEMS |
| | PAUL McGERALD LUCKETT |
| | DEE BATES |
| COURT FROM WHICH APPEALED: | LINCOLN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY:  GREG SPORE |
| | HUNTER N. AIKENS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  ALLISON KAY HARTMAN |
| | ROBERT W. BYRD |
| | LADONNA C. HOLLAND |
| DISTRICT ATTORNEY: | DEE BATES |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 03/07/2024 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1. Following a jury trial, Willie Cory Godbolt was found guilty of four counts of capital murder, four counts of first degree murder, two counts of kidnapping, one count of attempted murder and one count of armed robbery. For each of his capital murder convictions, the jury sentenced Godbolt to death. For his other convictions, Godbolt was sentenced to six life sentences and two twenty-year terms. From these convictions and sentences, Godbolt appeals. After a thorough review, this Court affirms Godbolt's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

¶2. On March 8, 2018, a Lincoln County grand jury returned a twelve-count indictment for Godbolt. The indictment charged Godbolt with four counts of capital murder, four counts of first degree murder, two counts of kidnapping, one count of attempted murder and one count of armed robbery. Jury selection for the trial took place in DeSoto County from February 10-14, 2020. Godbolt's trial took place from February 15-27, 2020, in Pike County. The following facts were developed at trial.

### I. Lee Drive Scene

¶3. On May 27, 2017, Godbolt dropped off his two children at Vincent and Barbara Mitchell's home on Lee Drive in Bogue Chitto. The Mitchells were Godbolt's in-laws. At the time, Godbolt and his wife, Sheena, were separated, and she was staying with Vincent and Barbara Mitchell—her step-father and mother. It was Memorial Day weekend, and the Mitchells were having a barbecue. Several other family members had gathered at the Mitchells' home on Lee Drive for the holiday celebration, including Tocarra May and Brenda May—Sheena's sister and aunt respectively—as well as Tamarya May—Sheena's niece and

2

Tocarra's daughter. Throughout the day, Godbolt and Sheena exchanged their children—M.G. and C.G.—several times. Later in the evening, Godbolt texted Sheena and told her that he was coming back to Lee Drive to pick up M.G. and C.G. In the text exchange, Godbolt expressed how much he loved his family and how he wanted it to remain intact. Sheena responded that she no longer wanted to be with Godbolt because he had hurt her. Sheena said that she would call the police if he came back to the house. Despite this warning, Godbolt returned to Lee Drive to pick up his children.

¶4.    Sheena called the police as soon as Godbolt arrived at Lee Drive. A little after 11:00 p.m., Amy Smith, a Lincoln County 911 dispatcher and operator, received the initial complaint asking for the removal of a person from the Lee Drive property; Smith dispatched Deputy William Durr, a Lincoln County Sheriff's Deputy.

¶5.    At trial, Vincent Mitchell testified that Godbolt entered the Mitchells' home on Lee Drive that evening and said that he was there to get his children. Godbolt was told by members of the family that the children were asleep and that he could pick them up the next morning. Godbolt continued to insist that he take his children home. Vincent testified that the conversation was held at a normal level; Sheena, however, testified that Godbolt was loud and was not using "his normal voice." At this point, Deputy Durr arrived at Lee Drive. When Deputy Durr entered the residence, he asked Godbolt to leave the home. Godbolt told Deputy Durr that Vincent Mitchell was actually Godbolt. After ascertaining who Godbolt actually was, Deputy Durr once again asked Godbolt to leave the residence. Vincent testified that Godbolt seemed like he was going to comply with Deputy Durr. When Godbolt turned to

3

leave, however, he faced Deputy Durr and pulled out a concealed gun. Godbolt then shot Deputy Durr in the face. Deputy Durr fell to the ground, and the other family members began to scatter. Godbolt began to shoot at the other family members in the house.

¶6.  Sheena testified that she saw Godbolt move to the kitchen and begin to shoot at her aunt, Brenda May, although she did not see whether Brenda was hit because she was running away. Tocarra May was also in the kitchen. After firing off several shots in the kitchen, Vincent testified that Godbolt returned to the living room and shot his wife, Barbara Mitchell. At this point, Vincent ran to his bedroom and hid. Sheena also ran into one of the bedrooms—where her children were—to escape the gunfire. Sheena broke one of the windows in the bedroom and she and her children escaped the home, ran into the surrounding woods and hid.

¶7.  Godbolt went to the door of Vincent's bedroom and began shooting through it. Vincent moved into the attached bathroom and called 911. While Vincent was hiding in the bathroom, he continued to hear shots being fired, both inside and outside the home. Meanwhile, Tamarya May was hiding in a car parked in the driveway. Tamarya's mother, Tocarra, had told her to stay outside when Deputy Durr had arrived at the house that evening. While Tamarya stood outside, she heard gunshots. Tamarya testified that she saw Godbolt exit the house while simultaneously shooting into the house. She then saw Godbolt reload his gun and enter the house again, and she heard several more shots fired. Tamarya testified that she saw Godbolt exit the house once more and retrieve another gun—"a big one"—from the trunk of his car. She then heard more gunshots coming from inside the house. By this

4

time, Tamarya had hidden herself inside her mother's car in the driveway, and she called 911 at 11:49 p.m.

¶8. Deputy Timothy Kees with the Lincoln County Sheriff's Department also heard the dispatch call to Lee Drive to remove someone from the residence and was en route. Deputy Durr was closer to the scene, however, and arrived at Lee Drive first. When Deputy Kees arrived at Lee Drive, he parked behind Deputy Durr's patrol car and immediately heard "pop noises, [that] sounded like shots." As Deputy Kees exited his vehicle and began to approach the home, Godbolt exited the home and began shooting at him. The State introduced evidence of gunfire exchanged between Godbolt and Deputy Kees: numerous bulletholes punctured the cars parked at Lee Drive—including the car in which Tamarya May was hiding—leaving spent projectiles and shell casings. Deputy Kees attempted to make contact with Deputy Durr several times via radio and received no response. When Deputy Kees felt a lull in the gunfire exchange, he returned to the trunk of his own vehicle to retrieve his assault weapon, and he testified that he lost sight of Godbolt.

¶9. More officers responded to Lee Drive within a few minutes. Deputy Kees believed that Godbolt had retreated back into the home, and he relayed that information to the other officers. The scene was then treated as having "an armed, barricaded subject." Investigator Andrew Montgomery with the Lincoln County Sheriff's Department testified that he remained at the Lee Drive scene for five hours, during which time gas canisters were discharged into the home to try and smoke Godbolt out. After a few hours on scene, however, the officers became aware that Godbolt was no longer in the home and that there had been

5

another shooting at a second location.

¶10.    In fact, after the shoot-out with Deputy Kees, Godbolt had run into the surrounding woods and had arrived at Lapeatra Stafford's home at approximately Midnight. Godbolt knocked on Stafford's door and identified himself as A.C., her neighbor. Stafford opened the door and Godbolt pushed through. Stafford testified that Godbolt told her, "I done fucked up. I done shot the police." Godbolt was armed with two assault rifles, and he asked Stafford to drive him somewhere. Stafford testified that she was hesitant, but Godbolt raised the rifles in each of his arms in a threatening manner and so she agreed to drive him. Stafford testified that she was afraid of what would happen if she refused to comply since her three children were asleep in the house.

¶11.    Stafford attempted to give Godbolt the keys to her van, but he insisted that she drive. Stafford got into the driver's seat, and Godbolt sat in the seat directly behind her. Stafford asked Godbolt where he wanted her to take him, and he told her to "just drive." After driving around for a while, Stafford and Godbolt parked behind a hotel in McComb, and Godbolt called his sister Shelly Porter. Godbolt told Shelly that he had messed up and had shot an officer, Brenda, and Barbara. Godbolt's sister set up a three-way call between Godbolt, her, and their cousin Johnny Hall, Jr., who was chief deputy of the Lincoln County Sheriff's Department. During the call with Shelly and Chief Deputy Hall, Godbolt told them that he "wasn't coming out of the house[,]" seemingly suggesting that he remained in the house on Lee Drive. After the call ended, Godbolt told Stafford that he had time because "[t]hey think that I'm in the house."

¶12. Godbolt and Stafford got back on the interstate and continued to drive around. They ended up at the home of Godbolt's close friend, Marvin Brumfield. Godbolt left his guns in Stafford's van and they went inside Brumfield's home. Godbolt, Stafford and Brumfield sat down and talked for a while. Godbolt told Brumfield that he had shot four people. Stafford testified that Godbolt spoke about how he was tired of people interfering in his marriage. Brumfield tried to convince Godbolt to turn himself in to the police. Brumfield testified that Godbolt seemed calm, if a little agitated.

## II.    Coopertown Road Scene

¶13. After a little while, Godbolt, Stafford and Brumfield left Brumfield's home with the intention that Godbolt was going to turn himself over to the police. Stafford thought that Godbolt was going to let her leave, but he insisted that she drive once again. Stafford and Brumfield sat in the front seats, and Godbolt resumed his seat behind Stafford in the van. Stafford testified that Godbolt placed the barrels of his rifles in the middle console between Stafford and Brumfield. During this drive, Stafford pulled the vehicle off the road, and they again engaged in conversation. Godbolt disclosed that he had killed Officer Durr, Brenda May, Tocarra May and Barbara Mitchell.

¶14. Godbolt then directed Stafford to drive him to Shon and Tiffany Blackwell's home on Coopertown Road. Tiffany Blackwell was Sheena's close friend, and Shon Blackwell was Godbolt's second cousin. Godbolt told Stafford and Brumfield that he wanted to talk to Shon. When they arrived at Coopertown Road, Brumfield was going to exit the van to get Shon so that Godbolt could speak to him. The Blackwells had also been celebrating the Memorial

7

Day holiday that day at a park in Brookhaven with friends and other family members. As the day had worn on, Shon, Tiffany and their children, A.B., J.B., and S.B., had returned to their home along with several other members of their family and friends to play games. During this time, Tiffany had received a phone call from Sheena telling her about the events at Lee Drive and asking Tiffany to come pick her up. Shon and Tiffany, along with Tiffany's sister, Shayla Edwards and their friend, Kimberly Lilly, left immediately for Lee Drive in Bogue Chitto, leaving their children at the Coopertown Road home.

¶15. Before he could get out of the van to retrieve Shon, Brumfield saw Godbolt arm himself with a pistol, and he jumped out of the van and began to wrestle with Godbolt. Godbolt placed one of his rifles on Brumfield's thigh, and Brumfield backed away. Brumfield testified that Godbolt was armed with a pistol and two assault rifles.

¶16. Godbolt approached the Blackwells' home on Coopertown Road and knocked on the door. Stafford saw Godbolt shooting at the door of the residence. Stafford drove away in her vehicle and called 911. Godbolt shot through the glass storm door and the locking mechanism of the front door on Coopertown Road. When Godbolt entered the residence on Coopertown Road, Shon and Tiffany were not present; only children remained in the home, including Shon and Tiffany's son J.B., Shayla Edwards's sons A.E. and C.E., Kimberly Lilly's son X.L. and K.P., a family friend. C.E. testified that he and the other children were playing cards and video games when he heard "a lot of pops." Everyone began to scatter, trying to get out and take cover. C.E. testified that a man (whom he, X.L. and K.P. later identified as Godbolt) entered and asked J.B. where his parents were. J.B. responded that

8

they had gone to Bogue Chitto. Then Godbolt fired off several shots, shooting and killing J.B. and A.E.

¶17. Godbolt asked for keys to a vehicle, and X.L. responded that he had some keys. X.L. tried to give Godbolt the keys, but Godbolt told X.L., "No. You're coming with me." Godbolt and X.L. left Coopertown Road in a gold Grand Marquis. Brumfield heard the gunshots and saw Godbolt leave with X.L. Brumfield then approached the home, saw the children and called 911.

¶18. Once Godbolt and X.L. left Coopertown Road, C.E. called 911 a little after 2:00 a.m. and informed the dispatcher that J.B. and A.E. had been shot. C.E. also called his aunt, Tiffany Blackwell, to inform her and the rest of the family that her son J.B. and C.E's younger brother A.E. had been shot. C.E. made a second 911 call along with K.P. several minutes later and was able to give the dispatcher more information. When law enforcement arrived at Coopertown Road, they found J.B. and A.E. deceased.

¶19. Meanwhile, Godbolt had taken X.L. and directed him to drive around. X.L. testified that Godbolt made several threatening statements towards him: "You know, if you – 'Drive or I'll kill you.' You know, 'Just drive normal, and it will all go smoothly,' and stuff like that." Around 3:00 a.m., while Godbolt and X.L. were driving around, Godbolt sent two messages to Tiffany Blackwell on Facebook, using his wife's account and her phone. The messages read: "Shon said I'm over with yep I am this duck going live oh baby what is you doing[,]" and "Pay back bitch fuck up my family now it's yours hoe and this bitch fucked Lee Lee." Sheena testified that Godbolt was the only other person with access to her Facebook

9

account and that he had her phone at the time. She also testified that he sometimes went by the nickname "Duck."

¶20. Godbolt directed X.L. to make several stops: first at a Walmart, next at Godbolt's house in Bogue Chitto, then at Henry Bracey's home in Bogue Chitto to retrieve a new car, then at Godbolt's aunt's house to retrieve another car and finally at Ferral and Sheila Burage's home on East Lincoln Road.

¶21. During their stop at Henry Bracey's home, Godbolt held both Henry and Alfred Bracey at gunpoint and demanded that they hand over keys to a car. Henry gave Godbolt keys to his wife's car, a Kia Forte, and Godbolt and X.L. left in the new vehicle. Henry's wife, Wykeshia, called 911 and informed the dispatcher that Godbolt had taken the car at gunpoint and left with X.L.

¶22. Kenyatta Godbolt, Godbolt's younger brother, testified that Godbolt showed up at their aunt's house with X.L. Godbolt demanded a car and held an assault rifle to X.L. as he counted down from five. Kenyatta gave Godbolt keys to a Nissan Altima, and Godbolt and X.L. drove away. X.L. testified that during the drive, Godbolt only identified himself as "Duck." He also testified that Godbolt kept a gun pointed at him while he was driving and that Godbolt acted as though "he had a mission or something that he was on." X.L. also characterized Godbolt as "scared mad . . . . He was very mad, and he was looking for Tiffany [Blackwell]. That's all he was saying."

### III.   East Lincoln Road Scene

¶23. When they arrived at Sheila and Ferral Burage's home on East Lincoln Road, Godbolt

10

told X.L. to pull into the driveway, drop him off and drive away. X.L. complied and drove home. Sheila and Ferral Burage were close family friends of both Godbolt and Sheena. Along with Sheila and Ferral, O.M. was also present in the home on East Lincoln Road when Godbolt arrived early in the morning on May 28, 2017. O.M. testified that Godbolt knocked on the Burages' door. When Ferral asked who was there, Godbolt responded, "it's me." O.M. testified that Ferral asked, "who is me[,]" and then Godbolt began to shoot at the door. O.M. ran and hid behind the table in the dining room. Once Godbolt had shot through the door, O.M. heard Godbolt walk through the hallways of the home and then heard him return to Sheila's bedroom and force open the bathroom door where Sheila was hiding. O.M. then heard several more gunshots.

¶24.    After Godbolt stopped shooting, O.M. heard him walk back through the home and talk on the phone with someone. O.M. testified that Godbolt told the person on the phone to take care of his son. Finally, Godbolt left the home, and the police arrived shortly after.

¶25.    Chris Godbolt, Godbolt's older brother, spoke with Godbolt on the phone early that morning. Godbolt told Chris that he was at Sheila's house and that he had shot and killed Sheila and Ferral. Godbolt also told Chris that Ferral had shot him. Chris testified that Godbolt asked him to take care of his kids during this phone call.

    **IV.    Godbolt's Arrest**

¶26.    At 6:17 a.m., Abby Thornton, a 911 operator for the Lincoln County Sheriff's Department, took a call from Angela Hardy, who had been on the phone with Sheila Burage when she heard the door being kicked in and gunshots through the phone call. Thornton

11

dispatched first responders to the scene on East Lincoln Road.

¶27. Deputy Chuck Francis with the Lincoln County Sheriff's Department was one of the first officers to arrive at the East Lincoln Road scene along with Deputy Patrick Hardy and Deputy Brian Magee. When they arrived, Godbolt was standing just off the road. The deputies ordered Godbolt to lie on his stomach in the road and placed him under arrest.

¶28. As Godbolt was being placed under arrest, an investigative reporter with the *Clarion-Ledger*, Therese Apel, approached the scene and began to videotape the arrest. Apel was able to record the scene in ten separate clips which were played for the jury. The videos depicted Godbolt's arrest and detainment as more law enforcement and medical personnel arrived on the scene. Throughout this time, Godbolt spoke about how much he loved his wife and children, and he stated that he had been shot. As Godbolt lay on the road, two officers placed their hands on his back, while a third placed pressure on his legs to keep Godbolt from kicking.

¶29. The video also depicted several exchanges between members of law enforcement and Godbolt. As Godbolt was held down on his stomach, a SWAT team member, Brian Sullivan, leaned down to Godbolt and asked exactly where the scene was located. Though Godbolt's response in the video is unintelligible, several officers repeated the number of the home belonging to the Burages, and they subsequently rushed to the scene. Godbolt also told Officer Sullivan exactly where Sheila's and Ferral's bodies were located within the home. Officer Sullivan asked Godbolt if he had been shot, to which Godbolt replied affirmatively. Sullivan then directed a medic to attend to Godbolt.

¶30.    Upon declaring once again that he had been shot, a second officer asked, "who shot you[,]" and Godbolt responded, "the guy in the house." Godbolt then stated that he could tell the officers where more victims were located if the officer putting pressure on his legs would remove himself. At this point, Master Sergeant Damian Gatlin approached Godbolt and read him his *Miranda*[1] rights. Godbolt responded that he understood his rights, and he continued to speak to law enforcement. An officer to the side of the scene spoke into his radio to record that Godbolt had been read his *Miranda* rights. The officers then transitioned Godbolt into a seated position, and a medic attended to the gunshot wound on his upper right arm. Godbolt then revealed that there were no more victims; he just wanted to sit up.

¶31.    While Apel continued to record the scene, Godbolt directed a question to her, asking, "you the police, ma'am?" Apel responded: "I'm the media." Godbolt then asked if someone was going to see about him, to which Apel replied that someone already was—presumably referring to his gunshot wounds. Godbolt then said that he could not hear her, stating, "I fucked my eardrum up, man, shooting that gun." Apel then asked Godbolt for a statement: "Do you want to say why you did all this?" Godbolt responded: "Because I love my wife and I love my children." Apel then asked, "So what about Deputy Durr's wife and children?" Godbolt responded: "I'm sorry . . . . My pain wasn't designed for him. He was just there."

**V.    Additional Evidence Presented at Trial**

¶32.    When law enforcement first entered the scene at Lee Drive, they found four deceased persons—Deputy Durr, Tocarra May, Brenda May and Barbara Mitchell. Through the

---

[1]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

testimony of Anna Savrock, the Lee Drive crime scene investigator, and Dr. Brent Davis, a forensic pathologist who performed the autopsy of Deputy Durr, the State introduced evidence that Deputy Durr had survived the first shot to the face and had potentially crawled on the ground a short distance before Godbolt shot him two more times. Savrock also testified that Deputy Durr's firearm remained secured in his holster and that it had not been fired. Savrock located what was later identified as Deputy Durr's wedding ring underneath his body. In combination, this evidence was used by the State to suggest that after the initial shot, Deputy Durr had attempted to crawl away, took off his wedding ring and held it to his chest before he was shot two more times by Godbolt.

¶33.    Autopsies confirmed that the cause of death for every victim was multiple gunshot wounds. Deputy Durr was shot three times; Brenda May was shot five times; Tocarra May was shot nine times; Barbara Mitchell was shot eight times; J.B. was shot four times; A.E. was shot four times; Ferral Burage was shot twelve times; and Sheila Burage was shot two times.

¶34.    Crime scene investigator Terrence Packer processed the East Lincoln Road scene for evidence. Packer collected four weapons from the scene: a .300 Blackout, two .40 caliber Smith & Wesson handguns and a Zastava Serbia. Weapons expert Tommy Bishop testified that he performed tests on the weapons collected from the scene and was able to identify numerous projectiles as having been fired from one of the .40 caliber handguns and the two assault rifles at Lee Drive, Coopertown Road and East Lincoln Road. He also testified that the .300 Blackout was "an AR-type gun" and that the Zastava Serbia was "an AK-type

firearm."

¶35.   Ryan Strange, owner of a pawn shop in Bogue Chitto, testified that he sold two weapons to Godbolt and one to Sheena and identified those weapons—the .300 Blackout, the Zastava Serbia and one of the .40 caliber Smith & Wesson handguns—by their serial numbers as the same ones found at the East Lincoln Road scene. The State also introduced evidence via Strange's testimony that Ferral Burage owned the second .40 caliber Smith & Wesson that was found at the East Lincoln Road scene.

¶36.   Packer further collected DNA evidence from the East Lincoln Road scene by taking swabs from an apparent trail of blood that wound throughout the home. A buccal swab obtained from Godbolt was found to match the DNA samples taken from the East Lincoln Road scene.

¶37.   Both entrance doors to the Coopertown Road and East Lincoln Road homes had been shot through numerous times. Greg Nester, the crime scene investigator at the Coopertown Road scene, testified that the storm door and interior wooden door had been shot through multiple times and that the door's locking mechanism had been completely broken. Terrence Packer testified that the door leading into the Burages' home on East Lincoln Road was riddled with bullets and bulletholes and that the upper glass portion of the door was broken. Packer also testified that the door leading into the bathroom where Sheila was hiding had been forced or shot open.

¶38.   In addition to the evidence introduced regarding the events that unfolded on May 27 and 28, 2017, the State also introduced evidence of Godbolt's prior bad acts through the

testimony of Sheena and M.G., Godbolt's wife and daughter. The court allowed this testimony under Mississippi Rule of Evidence 404(b)(2) in order to show motive.

¶39. Sheena testified that Godbolt had physically abused her throughout their marriage, resulting in at least one trip to the hospital. M.G. corroborated this testimony, stating that she saw Godbolt hit her mother numerous times. M.G. also testified about physical abuse perpetrated by Godbolt on her, stating that "he always used to beat me with a bat." Sheena and M.G. testified that these incidents of physical abuse towards them were precipitated by Godbolt's feeling a lack of control over a situation or of them.

¶40. M.G. also testified that earlier that day, on May 27, 2017, she saw Godbolt watching "gun videos[,]" depicting "how to reload and shoot them." M.G. stated that she saw Godbolt's guns that day prior to the events of the evening. She noticed that one was in his car and several more were on his bed, which she noted was unusual. Furthermore, M.G. testified that prior to dropping off M.G. and C.G. at their grandparents' house that evening, Godbolt told them that "he would die or kill before he let [them] stay with anybody else."

¶41. Lastly, Sheena, M.G. and Vincent Mitchell all testified regarding an occurrence of sexual assault that happened to M.G. while she spending the night at her grandparents'—Vincent and Barbara Mitchell's—home to provide some context for the encounter that occurred at Lee Drive on May 27. About a year prior to the incidents of May 27 and 28, 2017, M.G.'s male cousin had gotten on top of her and touched her inappropriately while they were dressed. Vincent witnessed the event and removed the cousin immediately. Godbolt wanted to press charges for the assault and for Barbara and Vincent's

16

failure to prevent it, but Sheena refused. Godbolt later had a discussion with M.G.'s cousin about the assault, after which the cousin was permitted and continued to fraternize with the family and M.G., and the issue was never raised again.

## VI. Trial

¶42. On March 8, 2018, Godbolt was indicted on twelve counts: four counts of capital murder for the murders of Deputy Durr, J.B., A.E. and Sheila Burage; four counts of first degree murder for the murders of Tocarra May, Brenda May, Barbara Mitchell and Ferral Burage; two counts of kidnapping for the kidnapping of Lapeatra Stafford and X.L.; one count of attempted murder for the attempted murder of Deputy Kees; and one count of armed robbery for the armed robbery of Alfred and Henry Bracey.

¶43. Godbolt's trial was held in two phases—first a guilt phase and then a sentencing phase. The guilt phase commenced on February 10, 2020, in DeSoto County, where the jury was drawn and selected. On February 15, 2020, opening arguments began in Pike County, where the trial was held. On February 25, 2020, the jury returned guilty verdicts on all twelve counts.

¶44. The following day, the sentencing phase of Godbolt's trial commenced to determine whether he would receive life sentences or the death penalty for his four capital murder convictions. In addition to all the evidence introduced during the guilt phase of trial, the State presented two victim impact witnesses for each capital murder victim.

¶45. For mitigation evidence, the defense introduced the testimony of Godbolt's former teacher, his aunt, his siblings—Chris and Shelly—his pastor, Marvin Brumfield and an expert

clinical psychologist. Through their testimony, the defense developed themes of three traumatic events that occurred in Godbolt's life. These events were the separation of his parents prior to his birth and his father's subsequent remarriage and family life with another woman, his father's murder perpetrated by Godbolt's step-mother for whom his father had left his mother and an occurrence of sexual abuse that happened to Godbolt when he was a young man.

¶46. Ultimately, on February 27, 2020, the jury sentenced Godbolt to death for all four of his capital murder convictions. Godbolt filed a post-trial motion for JNOV, a new trial, and other post-trial relief, which the court denied. On August 11, 2020, Godbolt filed his notice of appeal in this Court.[2]

### ISSUES PRESENTED

¶47. Two briefs were filed on behalf of Godbolt, one by his appellate attorney as well as a supplemental brief by Godbolt. The issues raised can best be summarized as follows:

I.      Whether the trial court erred by denying the motion to sever.

II.     Whether the trial court erred by failing to transfer physical venue.

III.    Whether the trial court erred by limiting defense counsel's voir dire.

---

[2] On November 14, 2023, oral argument was held in this case. Godbolt filed a pro se motion to present his own oral argument before this court alongside his counsel on October 16, 2023. A majority of this Court denied the motion. *See* En Banc Order 249323, ***Godbolt v. State***, No. 2020-DP-00440-SCT (Miss. Nov. 3, 2023). Following this Court's denial of his motion, on November 13, 2023, Godbolt filed a letter motion to request a rehearing of the denial. Pursuant to Mississippi Rule of Appellate Procedure 27(h), this Court generally does not grant motions for reconsideration. Because we find no reason to deviate from Rule 27(h) in this case (and the motion is obviously moot), we deny Godbolt's letter motion to reconsider granting oral argument.

IV.   Whether Godbolt's right to an impartial jury was violated.

V.    Whether the trial court erred by denying Godbolt's motion to suppress his statements made to Therese Apel and to law enforcement.

VI.   Whether the trial court erred by denying Godbolt's motion to suppress evidence obtained from his vehicle, home, cell phones and other electronic devices.

VII.  Whether the trial court erred by allowing Sheena Godbolt to testify at trial.

VIII. Whether the trial court erred by allowing evidence of prior bad acts.

IX.   Whether the trial court erred by allowing the introduction of numerous 911 calls into evidence.

X.    Whether the trial court erred by allowing the destruction of Godbolt's cell phone.

XI.   Whether the trial court erred by not enforcing the justice court order for a psychiatric evaluation.

XII.  Whether the trial court erred by allowing evidence of an unauthenticated Facebook message purportedly sent by Godbolt.

XIII. Whether the trial court erred by limiting Godbolt's allocution.

XIV.  Whether the trial court erred by allowing victim impact evidence.

XV.   Whether Godbolt received ineffective assistance of counsel.

XVI.  Whether the State committed prosecutorial misconduct during its closing arguments.

XVII. Whether Godbolt's death sentences based on the HAC aggravator are unconstitutional.

XVIII. Whether Godbolt's death sentences are unconstitutional under the Eighth Amendment.

XIX.  Whether cumulative error deprived Godbolt of a fundamentally fair

trial.

## DISCUSSION

¶48.    Though each issue on appeal has its own standard of review, this Court applies heightened scrutiny to capital cases involving the death penalty. *Clark v. State*, 343 So. 3d 943, 954 (Miss. 2022) (quoting *Dickerson v. State*, 175 So. 3d 8, 15 (Miss. 2015)). "In capital cases, non-procedurally barred claims are reviewed using '"heightened scrutiny" under which all bona fide doubts are resolved in favor of the accused.'" *Ronk v. State*, 267 So. 3d 1239, 1247 (Miss. 2019) (quoting *Crawford v. State*, 218 So. 3d 1142, 1150 (Miss. 2016)). Furthermore, "[w]hat may be harmless error in a case with less at stake becomes reversible error when the penalty is death." *Evans v. State*, 294 So. 3d 1152, 1157 (Miss. 2020) (internal quotation marks omitted) (quoting *Ronk*, 267 So. 3d at 1247).

### I.    Motion to Sever

¶49.    "For issues of severance, this Court applies an abuse-of-discretion standard of review." *Williams v. State*, 991 So. 2d 593, 602 (Miss. 2008) (citing *Rushing v. State*, 911 So. 2d 526, 532 (Miss. 2005)). Mississippi Code Section 99-7-2(1)-(2) (Rev. 2015) authorizes the act of charging multiple offenses in a single indictment and, if properly charged, the trying of multiple offenses in a single proceeding. Under Section 99-7-2(1), this is permissible "if: (a) the offenses are based on the same act or transaction; or (b) the offenses are based on (2) or more acts or transactions connected together or constituting parts of a common scheme or plan." Miss. Code Ann. § 99-7-2(1) (Rev. 2015). Section 99-7-2(2) states that if the multiple offenses are properly charged under subsection (1), then "all such

20

charges may be tried in a single proceeding." Miss. Code Ann. § 99-7-2(2) (Rev. 2015).

¶50.    Godbolt was charged with twelve separate offenses in his March 8, 2018, indictment. On January 10, 2019, Godbolt filed a motion to sever the counts and requested that the court order three separate trials based on the severance. Godbolt asked that the counts be severed according to the three different crime scenes—the Lee Drive charges, the Coopertown Road charges and the East Lincoln Road charges.

¶51.    This Court has established the procedure for a trial court to follow when a defendant requests severance, enumerating three factors to consider:

> When a defendant raises the issue of severance, we recommend that a trial court hold a hearing on the issue. The State, then, has the burden of making a prima facie case showing that the offenses charged fall within the language of the statute allowing multi-count indictments. If the State meets its burden, a defendant may rebut by showing that the offenses were separate and distinct acts or transactions. In making its determination regarding severance, the trial court should pay particular attention to whether the time period between the occurrences is insignificant, whether the evidence proving each count would be admissible to prove each of the other counts, and whether the crimes are interwoven.

*Corley v. State*, 584 So. 2d 769, 772 (Miss. 1991) (footnote omitted) (citing *Allman v. State*, 571 So. 2d 244, 248 (Miss. 1990)).

¶52.    In his motion, Godbolt argued that severance was warranted because the crimes charged at the three separate scenes were separated by several hours, the evidence necessary to prove each of the charges was separate and distinct, and the crimes were not interwoven. Godbolt also argued that by not severing the counts, he would be deprived of his fundamental right to a fair trial and his right to testify in his own defense or to remain silent. Specifically, Godbolt argued that he might wish to testify and assert an imperfect self-defense argument

for the charge of the first degree murder of Ferral Burage. Godbolt also argued that "the trial . . . on all of these joined counts [would] dilute his presumption of innocence" and would lead to undue prejudice.

¶53.   The State, in response, argued that severance was not warranted under the ***Corley*** factors because the time period between the crimes was insignificant, the same evidence would be admissible for multiple counts, and the crimes were interwoven and constituted a common plan or scheme. The State cited ***Rushing***, 911 So. 2d at 535, in which this Court affirmed the trial court's determination that a time period of five months was insignificant such that the multi-count indictment should not be severed. In the present case, the events occurred overnight between the hours of approximately 11:00 p.m. on May 27 to approximately 6:20 a.m. on May 28—a much shorter time period than five months. The State argued that "evidence from each of these counts would clearly otherwise be admissible under [Mississippi Rule of Evidence] 404 and to tell the complete story." Finally, the State argued that the crimes were inextricably interwoven, as Godbolt was seeking out the family members and close friends of his wife, evidencing a common scheme or plan.

¶54.   The trial court issued an order denying the motion to sever on March 4, 2019. In this order, the court found that:

> the amount of time during which these crimes were committed weighs against severance. The Court further finds that evidence proving each count would be admissible to prove other counts. It would be virtually impossible to try these cases as stand alone cases without evidence from the other crimes being introduced. Finally, the Court finds the crime to be interwoven as most of the victims were family members of [Godbolt] and/or his estranged wife.

Godbolt argues that the trial court's failure to sever the counts was error, urging the same

22

points argued in his original motion to sever. This Court finds that the trial court did not abuse its discretion by denying Godbolt's motion to sever when considering the *Corley* factors.

### A. Time Period Between Offenses

¶55. Godbolt argues that the time period between the separate offenses at the three separate crime scenes was significant and weighs in favor of severance. He argues that he spent hours "impulsively" driving around with Stafford, Brumfield and X.L. between each of the scenes. This Court has held that "[t]here is no bright-line test with regard to the time factor, and the trial courts are instructed to consider the totality of events surrounding each case." *Lomax v. State*, 192 So. 3d 975, 981 (Miss. 2016), *abrogated on other grounds by Portis v. State*, 245 So. 3d 457 (Miss. 2018).

¶56. This Court notes that while Godbolt was driving around, rather than creating a significant time period of separation between offenses, he was preparing for and committing more crimes that were charged in the multi-count indictment—the kidnapping of Stafford and X.L. and the armed robbery of Henry and Alfred Bracey. This Court has found several months to be an insignificant time period, whereas the offenses charged in Godbolt's indictment spanned mere hours. *See Rushing*, 911 So. 2d at 535-36; *Eakes v. States*, 665 So. 2d 852, 861-62 (Miss. 1995). The hours over which Godbolt committed these offenses were not significant, and they did not create breaks in his criminal actions. Instead, the time period constituted a continuation of Godbolt's crimes—the kidnappings and armed robbery—and preparation for future crimes—the murders at Coopertown Road and East Lincoln Road.

Therefore, this Court finds that the time period factor weighs against severance.

### B. Evidence Admissible to Prove Multiple Offenses

¶57. Godbolt argues that the second *Corley* factor also weighs in favor of severance, since the three scenes involved different victims, different eyewitnesses and different physical evidence. Godbolt concedes that some evidence would be admissible for multiple counts, such as the weapons collected from the East Lincoln Road scene and the close familial and community ties between the victims.

¶58. To the contrary, the trial court correctly found that "[i]t would be virtually impossible to try these cases as stand-alone cases without evidence from the other crimes being introduced." Most notably, perhaps, was the testimony of Stafford and X.L. In addition to her testimony about being kidnapped by Godbolt, Godbolt confessed his first four murders to Stafford. Stafford saw Godbolt shoot into the Coopertown Road home. Stafford heard the phone call between Godbolt and Chief Deputy Hall when Godbolt intimated that he was still in the Lee Drive house, and she testified about Godbolt's frustration with other people interfering in his marriage, both of which demonstrated Godbolt's intent and state of mind. X.L. testified about the murders of J.B. and A.E. at the Coopertown Road scene. He testified about his own kidnapping by Godbolt and that Godbolt identified himself as "Duck." X.L. testified about the armed robbery of the Braceys and about dropping Godbolt at the Burages' home on East Lincoln Road. X.L. was also able to lend testimony about Godbolt's intent and state of mind, stating that Godbolt seemed like he was on a mission, that he was "scared mad" and that he was looking for Tiffany Blackwell.

¶59. Testimony regarding the weapons used at each scene, the identification of ballistic evidence matching the weapons and the testimony of Ryan Strange identifying the weapons used as the same ones he sold to Godbolt would have overlapped on at least nine counts—the eight murder charges and the one attempted murder charge. Also significant to Godbolt's intent and state of mind for all counts was the testimony of his daughter M.G., who stated that she saw him watching videos depicting how to load guns and that he told M.G. and C.G. that "he would die or kill before he let [them] stay with anyone else."

¶60. This Court finds that there was significant overlap in the evidence that was necessary to prove the twelve separate counts in the indictment. Though not all of the evidence overlapped, the trial court did not abuse its discretion by finding that this factor weighed against severance of the counts.

### C. Common Scheme or Plan

¶61. Godbolt argues that his actions on the night of May 27 and the early morning of May 28 did not evince a common scheme or plan. He states that "[t]he gaps between the scenes were defined by chaos and spontaneity, not a planned scheme or course of action." Furthermore, Godbolt argues that the familial relations between the victims do not serve to make the offenses interwoven.

¶62. This Court finds that the trial court did not abuse its discretion by holding that the offenses were inextricably interwoven so as to constitute a common scheme or plan as contemplated in both Section 99-7-2(1)-(2) and *Corley*. Throughout the night, Godbolt sought out his wife's family and close confidantes—whom he perceived as interfering in his

25

marriage—after Sheena told him that she did not want to be with him anymore in a text message exchange prior to his arriving at Lee Drive. The State presented the case to the jury on the theory that Godbolt was extremely controlling in his personal relationships—particularly with his wife and children. That night, Sheena told him that she did not want to be with him, and she attempted to keep her children with her on Lee Drive. Godbolt, feeling a lack of control over his relationship, decided to punish Sheena by harming the people closest to her. For these reasons, the trial court correctly found the multiple offenses to constitute a common scheme or plan and denied severance.

### D. Risk of Prejudice

¶63. Lastly, Godbolt argues that the trial on the joined counts resulted in a "particularly acute" risk of prejudice. "[T]he joint trial of offenses creates a significant risk that the jury will convict the defendant upon the weight of the accusations or upon the accumulated effect of the evidence." *Gray v. State*, 549 So. 2d 1316, 1322 (Miss. 1989) (alteration in original) (internal quotation marks omitted) (quoting 2 Wayne R. LaFave and Jerold H. Israel, *Criminal Procedure* § 17.1(b) at 354-55 (1984)). Godbolt also complains that the denial of severance impaired his decision to testify or to remain silent particularly on Count XI, the first degree murder of Ferral Burage. Because Godbolt chose not to testify, he was unable to fully develop his theory of imperfect self-defense for the murder of Ferral Burage.

¶64. This Court has not ruled on severance of counts in light of a defendant's Fifth Amendment right against self-incrimination. This Court finds, however, that Godbolt does not have a right to "testify selectively" and the decision to sever lies within the trial court's

26

discretion. ***United States v. Fenton***, 367 F.3d 14, 22 (1st Cir. 2004) (quoting ***United States v. Alosa***, 14 F.3d 693, 695 (1st Cir. 1994)); *see* ***Corley***, 584 So. 2d at 772; ***Brown v. United States***, 356 U.S. 148, 154-55, 78 S. Ct. 622, 2 L. Ed. 2d 589 (1958).

¶65.    Each crime for which Godbolt was indicted benefitted from the testimony of at least one eye (or ear) witness at trial. The jury was scrupulously instructed—at the behest of Godbolt's counsel—that his guilt or innocence of each count must be considered separately. The jury was similarly instructed during the sentencing phase of Godbolt's trial regarding mitigating and aggravating factors.

¶66.    The jury was also instructed that no inference—whether of guilt or innocence—could be drawn from Godbolt's decision to remain silent. Godbolt received a self-defense jury instruction. He was voir dired twice on his right to testify or remain silent, and he chose not to testify. Furthermore, the court allowed Godbolt to address the jury during the closing statements at both phases of trial. For these reasons, Godbolt has failed to demonstrate the risk of prejudice from the denial of severance or any actual resulting prejudice.

## II.    Motion to Transfer Venue

¶67.    Godbolt was indicted for crimes taking place in Lincoln County, including the capital murder of a Lincoln County Sheriff's Deputy. On January 10, 2019, Godbolt filed a motion to transfer venue, arguing that he could not receive a fair trial in Lincoln County due to the nature of the indicted crimes, the close-knit community and the fact that the case had been so highly publicized. Godbolt requested that the court transfer the venue to a county with similar demographics to Lincoln County and that the trial be physically held in that county.

Initially, the court granted the motion in part, ordering that the jury be drawn and selected from DeSoto County. The jury was to be transported to Lincoln County after selection for the trial to be held. Subsequently, on the court's own motion, physical venue was transferred to Pike County. Thereafter, the jury was drawn and selected from DeSoto County, and the trial was held in Pike County.

¶68. On appeal, Godbolt argues that the trial court erred by failing to transfer physical venue to DeSoto County or another similarly situated county far from the activity of the case. Godbolt argues that the trial taking place in Pike County was essentially the same as if it had been held in Lincoln County since Pike County neighbored Lincoln County. Furthermore, the bailiffs for the case were supplied by Lincoln County. Godbolt argues that an "atmosphere of bias" pervaded the Pike County courthouse, depriving him of a fundamentally fair trial. "The decision to grant a change of venue rests soundly in the discretion of the trial judge." *King v. State*, 960 So. 2d 413, 429 (Miss. 2007) (citing *Howell v. State*, 860 So. 2d 704, 718 (Miss. 2004)). "This Court will not disturb the ruling of the trial court where the sound discretion of the trial judge in denying a change of venue was not abused." *Id.* (citing *Howell*, 860 So. 2d at 718).

¶69. The trial court transferred venue of the jury as well as physical venue. The record reflects that each bailiff was voir dired at the request of defense counsel to ascertain whether they had any personal connections to the case. Two of the bailiffs disclosed a familiarity with persons involved with the case. Larry Jointer said he knew J.B. and Godbolt from church. Charles Smith knew Deputy Durr from work. These bailiffs swore under oath that their

28

relationships would in no way affect their ability to serve on the case. The other bailiffs had no personal knowledge of anyone involved with the case. The jury was sequestered throughout the length of the trial. The trial judge noted several times throughout the trial how well the audience behaved, especially given the incredibly emotional nature of the case. Though the case was highly publicized, the jurors were questioned in voir dire about any prior exposure to the case, and none of the empaneled jurors cited any knowledge of the case outside of what they learned in the process of voir dire.[3] All in all, Godbolt *was granted* a change of venue, both of the jury pool and physically and, therefore, the trial court did not abuse its discretion by holding the trial in Pike County.

### III.     Limited Voir Dire

¶70.    Jury selection commenced in DeSoto County on February 10, 2020. In addition to general voir dire, on the second day of jury selection, the court began to individually voir dire the remaining jurors to qualify them for a death penalty case. After two full days of individual voir dire, the trial judge determined that in order to move the process along, he would ask the jurors the questions regarding their opinions on the death penalty, and the State and defense could follow up with any questions to the extent the jurors' answers contradicted the questionnaires they had filled out. The defense noted an objection to the court taking over the individual voir dire in that manner.

¶71.    "Voir dire of a jury is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." *Ambrose v. State*, 254 So. 3d 77, 120

---

[3]Section IV below details jurors' media exposure to the case.

(Miss. 2018) (internal quotation marks omitted) (quoting **Pitchford v. State**, 45 So. 3d 216, 229 (Miss. 2010)). "As such, the standard of review in examining the conduct of voir dire is abuse of discretion. An 'abuse of discretion will only be found where a defendant shows clear prejudice resulting from undue lack of constraint on the prosecution or undue constraint of the defense.'" **Id.** (citations omitted) (quoting **Howell**, 860 So. 2d at 727).

¶72. Godbolt complains of undue constraint on his attorneys' ability to fully probe the potential jurors' views on the death penalty. He argues that this constraint resulted in clear prejudice because the defense was forced to use three of its peremptory strikes on jurors who it felt had "troubling views on the death penalty[,]" and one juror—Kathryn Byford—was actually selected to serve on the case who the defense felt had disqualifying views on the death penalty. Notably, the defense neither challenged Byford for cause nor did they use a peremptory strike on her.

¶73. This Court finds that defense counsel was not limited in the process of voir dire. In fact, the individual voir dire of the potential jurors regarding their views on the death penalty was extensive, lasting four days and consisting of nearly eight hundred pages of transcript. Even when the court decided to ask the jurors the death penalty qualifying questions, both the defense and the State were allowed to ask follow-up questions to more fully probe the potential jurors' views on the death penalty, as well as any relation they had to law enforcement or past experiences with domestic violence. Therefore, on review, this Court finds that the trial court did not abuse its discretion by carrying out voir dire.

IV. **Right to an Impartial Jury**

¶74. "In general, voir dire is presumed sufficient to ensure a fair and impartial jury. To overcome the presumption, a party must present evidence indicating that the jury was not fair and was partial and must show that prejudice resulted from the circuit court's handling of voir dire." *Ambrose*, 254 So. 3d at 119-20 (internal quotation marks omitted) (quoting *Keller v. State*, 138 So. 3d 817, 843 (Miss. 2014)). "Whether a potential juror can be fair and impartial is a judicial question reserved for the trial judge and will not be disturbed unless clearly wrong." *Patton v. State*, 248 So. 3d 763, 767 (Miss. 2018) (citing *Archer v. State*, 986 So. 2d 951, 957 (Miss. 2008)). Furthermore, "no reversible error results when the trial court fails to sustain a challenge for cause and the juror(s) at issue is ultimately excused with a peremptory challenge." *Id.* (internal quotation mark omitted) (quoting *Sewell v. State*, 721 So. 2d 129, 135 (Miss. 1998)).

¶75. During the individual voir dire qualification process of jury selection, the defense noted several challenges for cause of jurors that the court denied, qualifying them for the final round of jury selection. The specific challenges for cause are detailed below.

### A. Marilyn Boyd

¶76. The defense challenged potential juror number 3, Marilyn Boyd, citing her emotional reaction when she disclosed to the court a matter of domestic violence involving a close friend of hers that had occurred a few months prior. The court denied this challenge, citing Boyd's answers to the court that she could be fair and impartial.

### B. Richard Roberts

¶77. The defense challenged potential juror number 7, Richard Roberts. The defense cited

Roberts's answer that the death penalty would be the appropriate punishment in the case of a murder committed during the course of a burglary. Roberts clarified, however, that he would still consider all the evidence. The court denied the challenge for cause, finding Roberts's clarification sufficient to qualify him for the case.

### C. Adam Wheeler

¶78. The Defense challenged potential juror number 33, Adam Wheeler, for cause, citing an inability to give potential mitigation evidence "meaningful effect." The following exchange occurred between Wheeler and defense counsel during individual voir dire:

> DEFENSE COUNSEL: If you were to find any of those capital murder charges beyond a reasonable doubt, no defenses, okay, would those facts of the case matter more to you than whatever sort of things you might hear about the Defendant's background in making your determination?
>
> WHEELER: Yes.
>
> DEFENSE COUNSEL: Okay. Now, if you were to hear evidence of the Defendant's background sounds to me like that's not going to be something that you take back with you and deliberate on as much as the facts of the case; is that right?
>
> WHEELER: Yes.

Following this exchange, the court asked Wheeler if he could consider all the evidence, both aggravation and mitigation, and consider both possible penalties of death or life without parole. Wheeler responded that he would consider all the evidence and both penalties. The court thereafter denied the challenge for cause.

### D. James Steven Ellis

¶79. The defense challenged potential juror number 43, James Steven Ellis, citing an

inability to give meaningful effect to mitigation evidence. The following exchange occurred

between defense counsel and Ellis during individual voir dire:

> DEFENSE COUNSEL: Okay. Things in a person's background that you need to look at include maybe bad things that happened to them as a child and bad reactions to it. And are you saying that you could or could not consider the bad things that may have happened to him as a child in his sentence?

> ELLIS: I mean, you can consider it but you're still going to be looking at the fact of when it was done.

> DEFENSE COUNSEL: And you would sentence him for who he was only on that day that he had committed a crime that you had convicted him of?

> ELLIS: Depending on the crime, yes.
> . . . .

> DEFENSE COUNSEL: [W]hat I hear you say is under those circumstances you would just look at what he did that day. Am I hearing you correctly?

> ELLIS: Yes, ma'am.

The court then asked Ellis if he would listen to all the evidence of aggravation and mitigation

before making a determination on an appropriate sentence. Ellis responded that he consider

all the evidence and follow the court's instructions. The court denied defense's challenge for

cause.

### E. Sandra Palmer

¶80.    The defense challenged potential juror number 43, Sandra Palmer. When asked about

her views on the death penalty in her juror questionnaire, Palmer noted that "unfortunately

it's needed in a lot of cases. Too much money goes into housing inmates for long periods of

time." The State asked Palmer if she could follow the court's instructions regarding what

could and could not be considered when evaluating Godbolt's possible sentence. Palmer

33

replied that she would follow the court's instructions and that she would not bring her concern about funding with her into jury deliberations. Finding that Palmer's answers qualified her to be on the case, the court denied the challenge for cause.

### F. Robert Anderson

¶81. The defense challenged potential juror number 52, Robert Anderson, for his belief that the death penalty was a strong deterrent to crime and that life without parole was not as strong a deterrent. The court found, however, that Anderson testified that he would always consider the mitigating factors and that he would follow the court's instructions. Therefore, the court denied the challenge for cause.

### G. Dr. Tosha Cookemboo

¶82. The defense challenged potential juror number 65, Dr. Tosha Cookemboo. The defense argued that Dr. Cookemboo only stated that she would do her best to be fair rather than unequivocally stating she could be fair. The court found, however, that Dr. Cookemboo also stated that she would weigh all the aggravating and mitigating evidence presented and that she would follow the instructions of the court.

### H. Jeffrey Wenzler

¶83. The defense challenged potential juror 67, Jeffrey Wenzler. The following exchange occurred between Wenzler and defense counsel:

> DEFENSE COUNSEL: Okay. And if you did find beyond a reasonable doubt that . . . Mr. Godbolt had intentionally killed the law enforcement officer . . . in that situation, would you be automatically considering the death penalty to be the appropriate punishment?
>
> WENZLER: That's kind of - - I mean, I believe so, yes.

The court followed up this questioning by asking Wenzler if he would consider the aggravating and mitigating factors and deliberate with his fellow jurors prior to returning a sentence. Wenzler replied that he would. For this reason, the court found Wenzler qualified to potentially serve on the jury.

### I. Jeffrey English

¶84.    The defense challenged potential juror number 74, Jeffrey English. Without phrasing its question to include the consideration of mitigation evidence, the defense asked English whether he thought the only appropriate punishment for the murder of one or more children would be the death penalty. English replied, "Tough question. Yes." The court then asked English if he would consider and give due weight to any mitigation evidence and deliberate with his fellow jurors prior to imposing any sentence. English replied that he would. This satisfied the court, and the challenge for cause was denied.

### J. Leanna Nail-Chism

¶85.    The defense challenged potential juror number 75, Leanna Nail-Chism. The defense argued that Nail-Chism's close relations to law enforcement (her husband and son were both law enforcement officers) rendered her unfit to serve on the jury in this particular case. The court disagreed, finding that Nail-Chism unequivocally answered that she would base any verdict on only evidence presented, she would follow the instructions of the court and she would consider all the evidence presented.

### K. Charlene Hairston

¶86.    The defense challenged potential juror number 92, Charlene Hairston. The  following

exchange occurred during individual voir dire:

> DEFENSE COUNSEL: [I]f the State could prove beyond a reasonable doubt that Mr. Godbolt had killed either one or both of those young people . . . would you still be able to listen to what we've called the aggravating and the mitigating evidence that you'd be presented in the penalty phase, or for you would it be that the crime is really enough and once you found Mr. Godbolt guilty that would be all you'd need and you would choose the death penalty?

> HAIRSTON: It's hard to separate this and decide. I would definitely do what the Court told me to do, but probably I would have to say that I would want to consider it as a death penalty.

> DEFENSE COUNSEL: Okay. And that seems like . . . it's a little different from what you said to [the State] because I'm focusing on the deaths of children. So for you that makes a difference?

> HAIRSTON: I guess it does. I didn't realize it until you put it that way but I guess yes.
> . . . .

> THE COURT: So, Ms. Hairston, were you mistaken when you told the Court that you would listen to mitigation evidence and aggravation evidence before you considered any verdict of death or life without the possibility of parole?

> HAIRSTON: No. I would consider all the evidence and then make a decision.

> THE COURT: Okay. . . . I don't know if you were confused about my questioning or if you were confused about [the defense's questioning]. I had asked you earlier . . . and you said you would listen to all of that evidence before you began deliberating or deciding whether your verdict would be death or life without parole and that you would talk to your fellow jurors about that. Is that still the way you feel or has that changed?

> HAIRSTON: No. I still feel that way. I'm sorry. I was a little confused with the way the question - - with how I was understanding the question.

The court denied the challenge for cause, finding that Hairston's answers that she would consider all the evidence prior to imposing any sentence were sufficient.

*L.*     *Mary Deaton*

36

¶87.     The defense challenged potential juror number 107, Mary Deaton. The defense argued that Deaton should be struck for cause because she could not fairly consider the mitigation evidence weighed against the potentially heavily emotional victim impact evidence. The court disagreed, noting that Deaton expressly said she could get past the emotionality of the potential victim impact evidence and would consider all the evidence presented.

¶88.     From these denied challenges for cause, all[4] were the subject of peremptory strikes. Furthermore, the trial court did not abuse its discretion by denying any for cause challenges. All the challenged jurors were rehabilitated and responded that they would weigh all the evidence presented.

¶89.     Godbolt additionally complains that his right to an impartial jury was violated under *Mhoon v. State*, 464 So. 2d 77 (Miss. 1985), *superseded by statute on other grounds as stated in Flowers v. State*, 158 So. 3d 1009, 1061 (Miss. 2014).  At the end of individual voir dire and prior to the selection of the jury, the defense noted an objection under the authority of *Mhoon*, stating that the jury pool was disproportionately comprised of jurors with personal connections to law enforcement and prior experiences with domestic violence.

¶90.     In the *Mhoon* case, James Mhoon was charged with capital murder. *Id.* at 78. The empaneled jury was a "unique and novel group." *Id.* at 80. After challenges for cause, the jury pool consisted of thirty-nine people, twelve of which "were either policemen or related by blood or marriage to a current or former police officer[.]" *Id.* One of those twelve failed to disclose her law enforcement connection. *Id.* When the jury was selected, six of the twelve

---

[4]No peremptory strike was utilized on Mary Deaton because the jury was selected prior to reaching her number.

seated jurors had close law enforcement connections. ***Id.*** In fact, the foreman of the jury was a current uniformed police officer. ***Id.*** All of the defense's peremptory challenges were exhausted during jury selection, and the challenges for cause against the jurors with law enforcement connections were denied "because each stated that the relationship would not influence their decision in this case and that they could render a fair decision based upon the evidence and the court instructions as to the law." ***Id.***

¶91.    On appeal, this Court found that the trial court committed error by denying the challenges for cause. ***Id.*** This Court held that

> In this particular case . . . the sheer number of law enforcement-connected persons in the jury pool, as well as persons selected as jurors, has worked a great hardship on Mhoon. Given the statistical aberration in the jury pool, the judge could have done several things to ameliorate its prejudicial effect: (1) he could have afforded counsel additional peremptory challenges, (2) he could have increased the size of the available venire as well as affording additional peremptory challenges, or (3) he could have sustained at least some of the challenges for cause.

***Id.*** at 81 (citation omitted). The Court also noted that "in the normal case—with a normal distribution of law enforcement officers and their relatives in the jury pool—there is no reason why, if left unchallenged peremptorily, an officer or an officer's relative should not serve on a jury if otherwise qualified to follow the law and evidence." ***Id.*** (citing ***Cook v. State***, 242 Miss. 29, 134 So. 2d 151 (1961); ***Gardner v. State***, 145 Miss. 215, 110 So. 589 (1926)).

¶92.    In the present case, Godbolt argues that a similar statistical aberration occurred in his jury pool. After challenges for cause, the jury pool consisted of forty-five potential jurors. Godbolt states that fourteen of those jurors had law enforcement connections. All of the

38

defense's peremptory challenges were exhausted during the course of jury selection, and its motion to remove the law enforcement-connected jurors for cause was denied. In denying the motion to remove the jurors for cause, the trial court found that "Voir dire was liberal. It was exhaustive, to say the least. And these people answered the questions appropriately, and the Court is going to deny the Defendant's motion to strike those jurors for cause." The potential jurors' law enforcement connections were as follows:

1. The grandfather of Anna MacDonald, potential juror number 4, had served as chief of Olive Branch police. She was chosen as juror number 1.

2. Renae Lynn Lindsey, potential juror number 12, had a daughter who worked for the Horn Lake police department.

3. Adam Wheeler, potential juror number 33, had a grandfather who had previously worked for the Southaven police.

4. Amanda Keeton, potential juror number 37, had a father-in-law who worked in law enforcement in Arkansas. She was chosen as juror number 6.

5. James Steven Ellis, potential juror number 43, had a brother who worked in a police department.

6. Joseph Horn, potential juror number 47, had three close friends who worked as law enforcement officers.

7. Potential juror number 48 Joey Simpson's brothers-in-law and father-in-law worked as ATF agents. He was selected as juror number 8.

8. Potential juror number 52 Robert Anderson's niece's ex-husband worked for the DeSoto County Sheriff's Department.

9. Jeffrey English, potential juror number 74, had an uncle and a cousin who worked as law enforcement officers.

10. Leeanna Nail-Chism, potential juror number 75, had a son and a husband who were law enforcement officers.

11. Kathryn Byford, potential juror number 77, had a brother who retired form the Nashville police department. She was selected to serve as juror number 11.

12. Kimberly Fetters, potential juror number 89, had a grandfather who had worked in law enforcement before she was born. She was selected to serve as alternate juror number 1.

13. Potential juror number 107 Mary Deaton's husband had retired from law enforcement.

14. Hannah Tyner, potential juror number 109, had a grandfather who worked in law enforcement, and her mother was a court reporter.

¶93. In *Evans v. State*, 725 So. 2d 613, 655 (Miss. 1997), this Court—distinguishing *Mhoon*—noted that a juror's statement under oath that they could be fair and impartial, despite their prior experiences or connections, was sufficient for the purposes of empaneling a fair and impartial jury. Likewise, every juror with a connection to law enforcement responded that they could be fair and impartial and reach a verdict based on the evidence presented at trial. The trial court was satisfied by these answers, and this Court has indicated its satisfaction with this oath of impartiality as well. *Id.*

¶94. To hold today that these jurors' oaths and affirmations of impartiality are ineffectual merely because they have some relation to law enforcement would be unprecedented. Notably, the *Mhoon* Court did "*not* hold that a person engaged in law enforcement, or related by blood or marriage to one engaged in law enforcement, should be excluded per se from jury service." *Mhoon*, 464 So. 2d at 82 (emphasis added). The *Mhoon* Court placed particular emphasis on the fact that a uniformed police officer served as the jury's foreman, creating a higher risk of undue influence on the opinions of the other jurors, and deemed the situation "novel." *Id.* Godbolt's empaneled jury only contained four jurors—as compared to the six

in *Mhoon*—with various degrees of connections to law enforcement, and no juror was an actual police officer, unlike the jury in *Mhoon*. Furthermore, while some of the potential jurors' relationships to law enforcement were by blood or marriage, others were much more attenuated connections and none of them were current or former law enforcement officers themselves. In contrast, Mhoon's venire consisted of twelve people, out of thirty-nine, who "were either policemen or related by blood or marriage to a current or former police officer," and half of the seated jury had some law enforcement connection. *Id.* at 80. Because Godbolt's venire and seated jury does not reach the level of statistical aberration found in *Mhoon*, we hold that *Mhoon* is inapplicable to the present case.

¶95. Lastly, Godbolt argues that the jury consisted of a disproportionate amount of people with domestic violence experience and media exposure to the case. This Court notes, however, that the only juror challenged for cause based on a prior domestic violence experience was potential juror number 3, Marilyn Boyd. The court denied the challenge, and she was the subject of a peremptory strike by the State. This Court found no unsettling media exposure of any jurors in the record. The only media exposure the potential jurors noted was a news story that a jury was being seated from DeSoto County. Therefore, this Court finds that these claims of error are without merit.

¶96. Because the court conducted extensive voir dire and the jury pool was not disproportionately made up of inherently biased jurors (based on law enforcement connections and prior domestic violence experiences), Godbolt's right to an impartial jury was not violated.

41

## V. Motion to Suppress Statements

¶97.    This Court "will only reverse a trial court's denial of a motion to suppress 'if the ruling is manifest error or contrary to the overwhelming weight of the evidence.'" ***Moore v. State***, 287 So. 3d 905, 911 (Miss. 2019) (quoting ***Barnes v. State***, 30 So. 3d 313, 316 (Miss. 2010)).

### A. Statements Made to Therese Apel

¶98.    Prior to trial, the court conducted a hearing on Godbolt's motion to suppress his statements recorded in the videos made by Therese Apel. The court denied the motion, finding that Apel was not acting as a state agent and, therefore, Godbolt was not subject to a custodial interrogation when he made the statements in the videos. On appeal, Godbolt argues that the court erred by denying the motion and by preventing Godbolt from fully cross-examining Apel concerning her source.

¶99.    According to Apel, she was awoken in the middle of the night when she received a phone call informing her that a deputy had been killed in Lincoln County. She testified that she had previously worked in the Brookhaven area, and she was familiar with law enforcement there. The defense attempted to elicit Apel's source but was blocked from doing so based on Apel maintaining the confidentiality of her sources. The defense noted an objection to this, claiming that Godbolt's Fifth and Sixth Amendment rights outweighed Apel's First Amendment right to maintain the confidentiality of her sources. Despite this, Apel testified that she was not *directed* by any member of law enforcement to go to the scene or to ask Godbolt any questions. Apel also stated that law enforcement officers were often

her sources of information. Furthermore, Apel explicitly told Godbolt that she was a member of the media before he answered her questions.

¶100. Godbolt takes issue with the fact that he was prevented from fully confronting Apel and determining whether or not her source was a law enforcement agent and whether, as a result, Apel was acting as a state agent.

> The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process.

*Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 297 (1973). "[F]or private conduct to be turned into state action, there must be a clear nexus between the state or law enforcement and a private investigation." *DeLoach v. State*, 722 So. 2d 512, 519 (Miss. 1998).

¶101. In this case, whether or not Apel's tip came from a law enforcement officer is irrelevant. Apel went to the scene looking for a news story, not as an agent of the state. She testified under oath that no law enforcement directed her to drive to Lincoln County or to ask Godbolt any questions. Godbolt was able to connect Apel to law enforcement through cross-examination at trial with Apel's testimony that she was friends with law enforcement in Lincoln County and that she had previously worked for the department of public safety. Ultimately, the disclosure of the source of Apel's tip would not have aided the defense's case since she never received any direction from law enforcement to go to the scene or to ask Godbolt questions. Therefore, the trial court did not abuse its discretion by denying the motion to suppress.

### B. Statements Made to Law Enforcement

¶102. Before Godbolt was read his *Miranda* rights and while law enforcement was arriving at East Lincoln Road, Agent Brian Sullivan asked Godbolt exactly where the scene was located and if he had been shot. Sullivan stated that the sole purpose of asking Godbolt the questions was for "life safety[,]" to determine where potential victims were located and if Godbolt required medical attention. Deputy Porter asked Godbolt who shot him in an attempt to determine if there were other active shooters.

¶103. The trial court admitted Godbolt's replies to Sullivan and Porter under the public safety exception established in *New York v. Quarles*, 467 U.S. 649, 655-56, 104 S. Ct. 2626, 81 L. Ed. 550 (1984), to custodial statements made prior to *Miranda* warnings. This Court finds that the trial court properly denied the suppression of these statements as public safety exceptions.

¶104. Godbolt also argues that he continuously requested an attorney while he was detained by officers at the East Lincoln Road scene. After a thorough review of the video record of Godbolt's arrest, this Court was unable to find a single instance in which Godbolt requested an attorney. After Godbolt was Mirandized by Gatlin, he continued to talk, without ever being prompted by law enforcement. He also complains that the detaining officers were causing him pain and he was therefore coerced into making self-incriminating statements. This Court notes, however, that when Godbolt complained of pain from the detention, the officers shifted themselves and eventually transitioned Godbolt into a seated position. Furthermore, other than the questions about where the scene was located and if Godbolt had

been shot, the officers never made any inquiry of Godbolt during the arrest. Therefore, Godbolt's claim of error regarding the admission of his statements to law enforcement officers lacks merit.

### VI.    Motion to Suppress Evidence

¶105.   Godbolt argues that the admission of evidence obtained from his home, vehicle, cell phone, other electronic devices and from his person violated his Fourth Amendment rights and constituted error. Aside from Godbolt's vehicle, warrants were obtained to search his home and all electronic devices, and the trial court denied the motion to suppress evidence found in connection to those valid warrants. Additionally, the State decided not to used the information found on Godbolt's cell phone at trial. Furthermore, Godbolt's person was lawfully searched pursuant to his arrest. *Rankin v. State*, 636 So. 2d 652, 657 (Miss. 1994). As for Godbolt's vehicle, the trial court found that it was properly searched under the automobile, plain view, exigent circumstances and abandonment exceptions to obtaining a warrant.

¶106.   This court reviews the admission of evidence for abuse of discretion. *Boggs v. State*, 188 So. 3d 515, 519 (Miss. 2016) (citing *Smith v. State*, 136 So. 3d 424, 431 (Miss. 2014)). The trial court did not abuse its discretion by admitting any of this evidence at trial, and this issue lacks merit. Only evidence obtained from the search of Godbolt's vehicle was admitted at trial. This evidence included a duffle bag containing multiple boxes of ammunition found in the vehicle. Savrock, the Lee Drive crime scene investigator, testified that the bag full of live rounds was visible through the open hatchback of Godbolt's car, which he left at the Lee

Drive scene. Savrock removed the bag from the vehicle when it began to rain outside and she worried that some of the evidence might become damaged. This search clearly falls under the automobile, plain view, exigent circumstances and abandonment exceptions to obtaining a search warrant, and the evidence was admissible.[5]

### VII. Spousal Testimony

¶107. Prior to Sheena Godbolt's testimony at trial, the court held a hearing regarding her ability to testify under Mississippi Rule of Evidence 601(b). Rule 601(b) provides:

> **(b) Competency of Spouse.** If one spouse is a party, the other spouse may not testify as a witness in the case unless both consent, except:
>
> . . . .
>
> **(2)** in a controversy between them; or
>
> **(3)** in a criminal case for:
>
> **(A)** a criminal act against a child[.]

MRE 601(b)(2)-(3)(A). Godbolt claimed the privilege to prevent Sheena from testifying and argued that her testimony was not exempt under Rule 601(b) since Godbolt was not charged with a crime against her to constitute a controversy between them and she was not present at the Coopertown Road scene involving crimes against children. Citing *Meeks v. State*, 604 So. 2d 748 (Miss. 1992), and *Stevens v. State*, 806 So. 2d 1031 (Miss. 2001), the court found that Sheena was competent to testify under both exceptions, noting that the case arose from a domestic dispute between them and his earlier finding that the crimes constituted a single

---

[5]*See **Wolf v. State**, 260 So. 2d 425, 430 (Miss. 1972); **Carney v. State**, 525 So. 2d 776, 785-86 (Miss. 1988); **Deeds v. State**, 27 So. 3d 1135, 1144 (Miss. 2009); **Ray v. State**, 238 So. 3d 1118, 1122 (Miss. 2018).

transaction and included a capital murder count against a child. Godbolt claims that allowing Sheena to testify was error.

¶108. This Court finds that Sheena's testimony was admissible because there was a controversy between Sheena and Godbolt. In *Maiben v. State*, 405 So. 2d 87, 90 (Miss. 1981), this Court found that a wife was competent to testify against her husband at trial because there was a controversy between them. Leroy James Maiben shot and killed Melvin Leroy Kirkland, his wife's father. *Id.* at 88. Maiben's wife, Dorothy, heard the gunshot and rushed into the room. *Id.* Maiben and his wife wrestled over the gun, and Maiben hit Dorothy repeatedly on her head. *Id.* Dorothy was able to wrestle the gun from her husband, and she ran to her neighbor's home. *Id.* At trial, Maiben was charged solely with the murder of Kirkland. *Id.* at 87.

¶109. Dorothy was willing to testify against her husband at trial, but Maiben sought to block the testimony pursuant to Mississippi Code Section 13-1-5, which provides that "[h]usbands and wives may be introduced by each other as witnesses in all cases, civil or criminal, and shall be competent witnesses in their own behalf, as against each other, in all controversies between them." *Maiben*, 405 So. 2d at 89 (quoting Miss. Code Ann. § 13-1-5 (Rev. 1972)). The court found Dorothy competent to testify, holding that the assault on Dorothy so close in time to the murder of Kirkland was "such a controversy between them as to make her a competent witness[.]" *Id.* The court also noted Dorothy's willingness to testify against her husband as being pertinent to its decision. *Id.*

¶110. Though this Court regards opinions from our Court of Appeals as merely persuasive,

47

we note that the Court of Appeals has found that a "heated argument" between spouses can constitute a controversy between them sufficient to find a spouse competent to testify. *Carpenter v. State*, 102 So. 3d 290, 294 (Miss. Ct. App. 2012). The reason Godbolt went to Lee Drive on the evening of May 27, 2018, was because a controversy existed between Sheena and him. Sheena wanted to keep her children with her, but Godbolt wanted to take the children with him. Godbolt also indicated his desire to stay married to Sheena and keep their family intact; Sheena, though, no longer wanted to be with him. This controversy sparked the events of the May 27 and 28, 2017, and the trial court therefore properly found Sheena competent to testify.

¶111. It should be noted that finding Sheena competent to testify pursuant to Rule 601(b)(3)(A) was error. Sheena had no personal knowledge of Godbolt's crimes against children, and she did not testify about the murders that took place at Coopertown Road. Mississippi Rule Evidence 602 requires that a witness have personal knowledge of a matter in order to testify about that matter. Nevertheless, because she was competent to testify under Rule 601(b)(2), her testimony was proper and admissible.

## VIII. Prior Bad Acts

¶112. Godbolt argues that the testimony of Sheena and M.G. regarding prior occurrences of domestic violence committed by Godbolt was substantially more prejudicial than probative and should have been excluded under Mississippi Rule of Evidence 403. The trial court allowed the testimony at trial pursuant to Mississippi Rule of Evidence 404(b), which allows evidence of a prior crime or wrongdoing to demonstrate motive.

48

¶113. "This Court reviews the admission of evidence under the abuse-of-discretion standard." ***Johnson v. State***, 204 So. 3d 763, 766 (Miss. 2016) (citing ***Smith***, 136 So. 3d at 431). "Evidentiary rulings are affirmed unless they affect a substantial right of the complaining party." ***Id.*** (internal quotation marks omitted) (quoting ***Sewell***, 721 So. 2d at 138). Mississippi Rule of Evidence 403 states that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

¶114. Prior to Sheena and M.G.'s testimony, the trial court held a Rule 404(b) hearing to determine admissibility. The trial court did not abuse its discretion by allowing the testimony regarding Godbolt's prior bad acts. In ***Jones v. State***, 920 So. 2d 465, 474 (Miss. 2006), this Court allowed the introduction of evidence of a prior assault perpetrated by Anthony Jones against his ex-girlfriend and victim in the case, Taquelia Thomas. There, this Court held that "[t]o hold this evidence inadmissible as evidence of a prior bad act would be to hamstring the State in the presentation of the complete story of Jones's crime." ***Id.*** at 475.

¶115. The testimony of Sheena and M.G. was essential to the State's theory of the case, namely Godbolt's controlling and abusive nature towards his immediate family, to show Godbolt's motive for committing the crimes. Additionally, the trial court did not abuse its discretion under Rule 403. The probative value of the testimony was not substantially outweighed by the danger of unfair prejudice. Sheena and M.G.'s testimony that Godbolt was controlling and physically abusive was extremely probative in showing Godbolt's intent and

49

motive. Furthermore, "[e]vidence of other crimes may be admissible to tell the complete story, so the jury will not be confused." ***Hargett v. State***, 62 So. 3d 950, 953 (Miss. 2011) (citing ***Palmer v. State***, 939 So. 2d 792, 795 (Miss. 2006)). In the present case, the context of Godbolt's prior abuse and control of his family allowed the jury to grasp the complete story of the events and to better understand why the situation at Lee Drive escalated. Therefore, the trial court did not abuse its discretion by allowing this testimony.

### IX. 911 Calls

¶116. Prior to trial, the court held a hearing on the admissibility of various 911 calls made throughout the evening of May 27 and the morning of May 28, 2017. For each of the ten separate 911 calls played for the jury during trial, the court ruled that they were admissible under the present sense impression and excited utterance exceptions to the general hearsay prohibition and that they were more probative than prejudicial under Rule 403. Godbolt argues that nine of the ten were substantially more prejudicial than probative, especially when viewed as a group. Godbolt also argues that the calls were needlessly cumulative of trial testimony.

¶117. "[O]ur task as an appellate court reviewing a Rule 403 determination is not to engage anew in the Rule 403 balancing process. Rather, this Court must simply determine whether the trial court *abused its discretion* in weighing the factors and admitting or excluding the evidence." ***Carter v. State***, 953 So. 2d 224, 229 (Miss. 2007) (alteration in original) (internal quotation mark omitted) (quoting ***Baldwin v. State***, 784 So. 2d 148, 156 (Miss. 2001)).

¶118. The trial court conducted a Rule 403 balancing test for every 911 call entered into

evidence, finding that each one was more probative than prejudicial. Godbolt argues, however, that the trial court "failed to consider the prejudicial effect of the calls collectively, as well as their needlessly cumulative nature." He states that the only difference between the trial testimony and the 911 calls was the heightened emotion in the callers' voices, which only served to inflame the jury.

¶119. This Court reiterates that the admission of evidence is reviewed for abuse of discretion. *Carter*, 953 So. 2d at 229. The calls evinced Godbolt's movements throughout the night, gave precise time references, gave victim locations and demonstrated the callers' various reactions and attempts to seek help from law enforcement. Though they were admitted in conjunction with testimony from most of the callers, the trial judge found that they were not unfairly prejudicial or needlessly cumulative especially given the volume of criminal offenses committed by Godbolt over the course of the night. Therefore, the trial court did not abuse its discretion by admitting the 911 calls.

### X. Destruction of Cell Phone

¶120. Godbolt argues that the State committed a *Brady*[6] violation in the destruction of his cell phone. Godbolt claims that during the process of data extraction from his cell phone, the phone was destroyed. He claims that the phone contained exculpatory evidence that would have been valuable to impeach the testimonies of Chief Deputy Hall, Sheena and M.G.

¶121. In order to establish a *Brady* violation, Godbolt must show:

> (1) that the government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the

_____

[6]*Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

*Manning v. State*, 158 So. 3d 302, 305 (Miss. 2015) (quoting *King v. State*, 656 So. 2d 1168, 1174 (Miss. 1995)). Not only does Godbolt completely fail to demonstrate that the State possessed evidence that was favorable to him, the record reveals that Godbolt received the data and information extracted from the cell phone prior to trial. Therefore, this claim is without merit.

### XI.    Motion and Order for Psychiatric Evaluation

¶122.  Prior to his indictment, Godbolt's counsel filed a motion for a psychiatric evaluation of Godbolt, which was granted by the justice court judge. It does not appear from the record, however, that this psychiatric evaluation ever took place. Godbolt was subsequently appointed new counsel who filed a motion to renew several of the orders from justice court in the circuit court but did not move to renew the order for a psychiatric evaluation. Eventually, the State filed its own motion for Godbolt to undergo a mental evaluation on November 5, 2018. On November 13, 2018, the defense filed a reply and objection to the State's motion seeking a mental evaluation. At a status conference and motion hearing, the court determined to hold the motion in abeyance until such a time as the defense indicated that Godbolt's competency was in question. The defense never raised competency as an issue.

¶123.  On appeal, Godbolt argues that pursuant to Mississippi Rule of Criminal Procedure 12.2(a), the trial court should have ordered a the defendant to submit to a mental

examination. Rule 12.2(a) states:

> **(a) Competency to Stand Trial or Be Sentenced.** If at any time before or after indictment, the court, on its own motion or the motion of any party, has reasonable grounds to believe that the defendant is mentally incompetent, the court shall order the defendant to submit to a mental examination.

Godbolt assigns blame both to the trial court, for failing to enforce the justice court's earlier order and for failing to raise the issue sua sponte, and to his own defense counsel, for failing to request a competency evaluation or to place Godbolt's competency in issue.

¶124. Early on, the State did file a motion for Godbolt to undergo a psychiatric evaluation. This motion was opposed by the defense, and the trial court did not order the evaluation to take place. The record is devoid of evidence indicating whether a mental examination was necessary in order for Godbolt to stand trial. The defense never raised the issue of Godbolt's competency. Therefore, the issue of whether Godbolt's counsel should have raised the issue of competency or asserted an insanity or diminished capacity defense is best reserved for a future petition for post-conviction relief with the benefit of a more complete record.[7]

## XII. Facebook Message Authentication

¶125. Godbolt argues that the Facebook messages sent from Sheena Godbolt's Facebook account to Tiffany Blackwell's Facebook account were not properly authenticated. This Court reviews the admission of evidence under an abuse of discretion standard. *Smith*, 136 So. 3d at 431 (citing *Young v. Guild*, 7 So. 3d 251, 262 (Miss. 2009)). Mississippi Rule of Evidence 901(b)(1) allows the testimony of a witness with firsthand knowledge "that an item

---

[7]Section XV below contains a discussion of Godbolt's ineffective assistance of counsel claim.

is what it is claimed to be" to satisfy the requirement of authentication.

¶126. Godbolt cites **Smith**, 136 So. 3d at 431, to support his claim that the messages were not properly authenticated. In **Smith**, this Court found that the admission of Facebook messages purportedly sent by the defendant from his account were not properly authenticated because "the only information tying the Facebook account to Smith was that the messages purported to be from a 'Scott Smith' and were accompanied by a very small, grainy, low-quality photograph that we can only assume purported to be Smith." **Id.** at 434. Furthermore, the only evidence that the messages were actually sent by Smith was the testimony of his wife that Smith had sent those messages to her. **Id.** "[Smith's wife] did not testify as to how she knew that the Facebook account was Smith's, nor did she testify as to how she knew Smith actually authored the Facebook messages." **Id.**

¶127. The concerns of the Court in **Smith** are not the same as the ones in the present case. In **Smith**, this Court was concerned with authentication in the context of fabrication of a user account in order to masquerade as another person. **Id.** at 432-33. In the present case, Sheena Godbolt was able to testify as to how she knew the messages were authored by Godbolt—because he had her phone and he used his nickname in the message. Sheena was able to identify the Facebook account as belonging to Sheena, eliminating the concern regarding fabrication of an account.

¶128. Sheena testified that Godbolt had access to her account and that he had her phone at the time the messages were sent. Sheena also testified that Godbolt sometimes went by the nickname "Duck," which was used in one of the messages. She testified that Kenyatta,

54

Godbolt's younger brother, showed her the Facebook message sent from her account to Tiffany. Sheena identified the account as belonging to her and she noted that, other than she, only Godbolt had access to the account and that he had her phone at the time. Tiffany Blackwell also testified that she received the message from Sheena's account and that she had been with Sheena earlier that evening and knew Godbolt had her phone. Therefore, the State presented sufficient evidence to authenticate the messages.

## XIII. Limited Allocution

¶129. After the defense called its last witness in the guilt phase of the trial, the jury exited the courtroom briefly, and the defense announced its intention to rest its case. The judge called Godbolt to the podium and voir dired him regarding his decision not to testify in his own defense. The following exchange occurred between the judge and Godbolt:

> THE COURT: Mr. Godbolt, in the State of Mississippi as well as I believe in every other jurisdiction within the United States a Defendant in a criminal action has an absolute right to testify and an absolute right not to testify and no negative inference can be drawn by your failure to testify. Do you understand that?
>
> GODBOLT: Yes, sir. I do.
>
> THE COURT: While [your attorneys] may counsel you with regard to whether they think you should testify, the ultimate decision as to whether you wish to testify is yours. Do you understand?
>
> GODBOLT: Yes, sir. I do.
>
> THE COURT: And have you and your attorney had ample opportunity to discuss the matter?
>
> GODBOLT: Yes, sir. We have.
>
> THE COURT: And have they explained all of the things that I've just told

55

you?

GODBOLT: Yes, sir. They have.

THE COURT: And have you made a decision as to whether or not you wish to testify?

GODBOLT: Yes, sir. I have.

THE COURT: And what is that decision?

GODBOLT: I choose not to.

Thereafter, the jury returned to the courtroom, and the defense officially rested its case. Following this, both parties and the court conferred on jury instructions for the guilt phase. Once the jury instructions had been ruled on by the court, Godbolt requested to speak with his attorney and informed her that he had changed his mind and that he wished to testify. The court denied Godbolt's request, noting that Godbolt was voir dired prior to the close of the case, that he adequate time to discuss the matter with his counsel and that he had decided not to testify.

¶130. After the jury instructions had been read to the jury, Godbolt requested fifteen minutes of defense's closing argument time to speak to the jury on his own behalf in the manner of allocution. The court allowed Godbolt allocution and impressed upon Godbolt that he was bound by the same rules as his own attorneys during closing arguments—namely that "closing argument in the guilt phase of a trial has to be tied to the evidence." During his allocution, the State objected several times due to Godbolt's arguing points that had not been introduced into evidence. Godbolt was given the full fifteen minutes, however, and was able to address the jury prior to their determination of his guilt.

¶131. Godbolt was given a second opportunity for allocution during the closing arguments of the sentencing phase of his trial after he was voir dired a second time on his decision not testify during the sentencing phase. For his second allocution, Godbolt was allotted twenty minutes. Once again, the State made several objections to Godbolt speaking to matters outside of the evidence presented and asked that he address the jury instead of members of the audience. During his second allocution, the record notes that the proceedings were briefly interrupted by Sheena Godbolt, and she was removed from the courtroom. The court recessed for a short time, noting that Godbolt had thirteen and half minutes remaining of his allocution. When court resumed, the judge reminded Godbolt to stick to the evidence that had been introduced and allowed him to resume his allocution. Godbolt completed his full twenty minutes of allocution.

¶132. On appeal, Godbolt argues that the trial court limited his allocution to "a plea for mercy and precluded any mention of controverted factual issues." The only objections or limitations made to Godbolt's allocution were when he began to speak about matters that had not been introduced into evidence during the course of the trial. Godbolt was told by the court that his allocution needed to be tied to the evidence, much like his attorneys' closing arguments. Godbolt was given the full amount of allocution he requested on both occasions. Furthermore, "[t]here is no absolute right of allocution under criminal practice in Mississippi[,]" and yet Godbolt was afforded the opportunity in both phases of his trial. *Johnson v. State*, 461 So. 2d 1288, 1292 (Miss. 1984). For these reasons, the trial court did not commit error concerning Godbolt's allocution.

**XIV. Victim Impact Evidence**

¶133. During the sentencing phase, for each capital murder victim, two victim impact witnesses were introduced by the State. Prior to trial, the defense filed a motion to limit victim impact testimony. After each of the victim impact witnesses testified, the defense once again moved to exclude all of the testimony for the State's failure to make a prima facie case supporting the victim impact evidence. The court denied the motion. On appeal, Godbolt argues that the court erred by admitting victim impact evidence that was irrelevant with regards to the aggravating circumstances.

¶134. "Victim impact evidence is admissible at sentencing, though not at the culpability phase of trial." *Havard v. State*, 928 So. 2d 771, 792 (Miss. 2006) (citing *Payne v. Tennessee*, 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991)). This Court allows "the opinions of the victim's family members as to the crimes and the defendant as permissible victim impact testimony." *Id.* (citing *Wells v. State*, 698 So. 2d 497, 512 (Miss. 1997)). "When the evidence is proper, necessary to a development of the case and the true characteristics of the victim, and could not incite the jury, the testimony is admissible." *Batiste v. State*, 121 So. 3d 808, 864 (Miss. 2013) (citing *Havard*, 928 So. 2d at 792).

¶135. All of the victim impact testimony was elicited from family members of the four capital murder victims: Deputy Durr, J.B., A.E. and Sheila Burage. Each of the family members testified regarding the impact their losses had on them and other family members and friends. They also testified about the characters of the victims. Deputy Durr's wife testified about his hobbies, which included ventriloquism, youth ministry and hunting with

58

his son. Deputy Durr's mother testified about his close familial relationships and the way his loss affected those relationships. Tiffany and Shon Blackwell testified about J.B.'s athletic ambitions and his efforts to be a good brother and protector of his siblings. Shayla Edwards testified about things her son A.E. loved to do: dancing, art, cooking and reading. She also testified about the effect of his loss on his siblings. J.B. and A.E.'s grandmother testified about her loving relationship with her grandsons and the effect their loss had on the family. Myrtis and Christiana May, Sheila's sister and daughter respectively, testified about Sheila's work in the community and the effect her loss had on their family. All of the victim impact testimony elicited was proper and gave accounts of the victims' characteristics as well as the impact of their loss. Therefore, the victim impact evidence was relevant, and the court did not err by permitting the testimony.

## XV. Ineffective Assistance of Counsel

¶136. Godbolt argues that he received ineffective assistance of counsel. "[G]enerally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Ross v. State*, 288 So. 3d 317, 324 (Miss. 2020) (alteration in original) (internal quotation marks omitted) (quoting *Bell v. State*, 202 So. 3d 1239, 1242 (Miss. 2016)). "This Court will address such claims on direct appeal when '[1] the record affirmatively shows ineffectiveness of constitutional dimensions, or [2] the parties stipulate that the record is adequate and the Court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc.[,] are not needed.'" *Id.* (alteration in original) (quoting *Bell*, 202 So. 3d at 1242). In the case that neither of these factors is

present, "the appropriate procedure is to deny relief, preserving the defendant's right to argue this issue through a petition for post-conviction relief (PCR)." ***Dartez v. State***, 177 So. 3d 420, 423 (Miss. 2015) (citing ***Read v. State***, 430 So. 2d 832, 837 (Miss. 1983)). Godbolt claims ineffectiveness on several counts: 1) that his counsel failed to investigate potentially exculpatory evidence contained in his sent text messages, 2) that his counsel failed to sufficiently cross-examine State witnesses, 3) that his counsel failed to obtain a psychiatric evaluation and 4) that his counsel failed to review and utilize police and lab reports that contained potentially exculpatory information.

¶137. The record before this Court lacks sufficient evidence and information in order to address this claim on direct appeal. Therefore, the issue is preserved for Godbolt's potential future PCR petitions.

## XVI. Prosecutorial Misconduct

¶138. In his brief, Godbolt claims that the State committed prosecutorial misconduct resulting in undue prejudice. Specifically, Godbolt complains that the prosecutor's statement during closing arguments that "[Godbolt] went [to Lee Drive] with the intent to kill" was a tactic to inflame the jury and prejudice Godbolt. Godbolt also argues that the use of the terms "assault weapons" or "assault rifles" were incorrectly used to describe the weapons found at East Lincoln Road.

¶139. "The standard of review that appellate courts must apply to lawyer misconduct during opening statements or closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a

decision influenced by the prejudice so created." *Jackson v. State*, 174 So. 3d 232, 236 (Miss. 2015) (internal quotation marks omitted) (quoting *Caston v. State*, 823 So. 2d 473, 495 (Miss. 2002)). First, the defense never objected to either of these characterizations of which Godbolt complains. Failure to object acts as a waiver of the issue on appeal. *Id.* (quoting *Havard*, 928 So. 2d at 791). Nevertheless, both of the characterizations by the State during closing arguments were reasonable deductions grounded in the evidence presented and did not misstate facts. Tommy Bishop, the weapons expert, provided testimony that Godbolt used assault weapons. Therefore, the prosecution did not make any improper statements or arguments during its closing arguments.

### XVII. Constitutionality of HAC Aggravator

¶140. During jury instruction deliberations, Godbolt noted an objection to the constitutionality of the inclusion of the heinous, atrocious or cruel (HAC) aggravator as well as the sufficiency of the evidence presented by the State regarding the heinous, atrocious or cruel nature of the capital murders of Deputy Durr and Sheila Burage. The court overruled both of these objections and allowed the HAC aggravator to be considered for the murders of Deputy Durr and Sheila Burage. The HAC jury instruction given at sentencing read as follows:

> The Court instructs the jury in considering whether the capital offense was especially heinous, atrocious or cruel; heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.

> An especially heinous, atrocious or cruel capital offence is one accompanied by such additional acts as to set the crime apart from the norm

61

of capital murders – the conscienceless or pitiless crime which is unnecessarily torturous to the victim. If you find evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, that there was dismemberment of the body prior to death, that the defendant inflicted physical or mental pain before death, that there was mental torture and aggravation before death, or that a lingering torturous death was suffered by the victim, then you may find this aggravating circumstance.

On appeal, Godbolt argues that "[t]he instruction was unconstitutionally vague and insufficient to avoid the arbitrary imposition of the death penalty" and that the State did not present sufficient evidence to warrant the instruction.

¶141. This exact HAC instruction has been approved by this Court. *King v. State*, 784 So. 2d 884, 891 (Miss. 2001) (quoting *Edwards v. State*, 737 So. 2d 275, 315 (Miss. 1999)). In light of this Court's prior ruling, the HAC aggravator instruction was constitutionally sound and sufficient to avoid the arbitrary imposition of the death penalty.

¶142. As for the sufficiency of the evidence presented by the State to warrant the instruction, this Court reviews the challenge to "determine whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Ambrose v. State*, 133 So. 3d 786, 791 (Miss. 2013) (quoting *Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005), *abrogated on other grounds by Little v. State*, 233 So. 3d, 288, 292 (Miss. 2017)). "[T]his Court will reverse only when the facts and inferences which were considered 'point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty.'" *Id.* (quoting *Hughes v. State*, 983 So. 2d 270, 275-76 (Miss. 2008)).

¶143. When viewing the evidence in the light most favorable to the State, sufficient evidence was presented to warrant the HAC instruction as to the capital murders of Deputy Durr and Sheila Burage. This Court has held that "'[t]he number of wounds, the number of lethal weapons used to inflict these wounds, and the fact that death was not immediate, but prolonged' may all be considered as evidence supporting a jury's finding of the HAC aggravator." *Dickerson*, 175 So. 3d at 30 (internal quotation marks omitted) (quoting *Batiste*, 121 So. 3d at 870).

¶144. The State presented evidence that Deputy Durr survived the initial gunshot to the face and that he took off his wedding ring and held it against his chest as he crawled along the floor before he was shot by Godbolt two more times. The State also presented evidence that after Godbolt had shot through the door and killed Ferral Burage, Sheila Burage hid in the bathroom of her home as Godbolt stalked through the home, looking for her and leaving behind a trail of blood. Godbolt eventually found Sheila, forced open the bathroom door and shot her two times as she cowered in the bathroom. Godbolt was armed with and utilized three separate weapons at all three scenes. When viewing this evidence in the light most favorable to the State, it was sufficient to warrant the HAC aggravator jury instruction.

### XVIII. Constitutionality of Death Penalty

¶145. Godbolt argues that his death sentences are unconstitutional because they constitute cruel and unusual punishment under the Eighth Amendment. He also acknowledges that under current law, neither this Court nor the United States Supreme Court have recognized the death penalty as unconstitutional pursuant to the Eighth Amendment. As this stance has

not been recognized, Godbolt's death sentences are not unconstitutional. *See Dickerson*, 175 So. 3d at 33-34; *Chamberlin v. State*, 55 So. 3d 1046, 1056 (Miss. 2010); *Bennett v. State*, 990 So. 2d 155, 160-61 (Miss. 2008).

### XIX. Proportionality of Death Penalty

¶146. Though not raised by the parties on appeal, this Court must review the proportionality of Godbolt's death sentence, both as to his convictions and as to Godbolt himself, pursuant to Mississippi Code Section 99-19-105(3)(c) (Rev. 2020). This Court has upheld sentences of death for capital murders of an officer in the line of duty as well as capital murders with the underlying felony of burglary. *See Stevens*, 806 So. 2d at 1031; *Hodges v. State*, 912 So. 2d 730 (Miss. 2005) disagreed with by *Ross v. State*, 954 So. 2d 968, 987-88 (Miss. 2007); *Hansen v. State*, 592 So. 2d 114 (Miss. 1991); *Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

¶147. The State presented the following aggravating circumstances for the murder of Deputy Durr: (1) that the defendant presented a great risk of death to many persons, (2) that the offense was committed for the purpose of avoiding a lawful arrest of effecting an escape from custody, (3) that the offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws and (4) that the offense was especially heinous, atrocious or cruel. The jury found all four aggravating circumstances beyond a reasonable doubt.

¶148. The State presented three aggravators for the murders of J.B. and A.E. These were that: (1) the defendant knowingly created a great risk of death to many persons; (2) the

offense was committed while the defendant engaged in the commission of the crime of burglary; and (3) the offense was committed while the defendant was engaged in the flight after committing kidnapping. The jury found all three aggravating circumstances present in the murders of J.B. and A.E.

¶149. The State presented the following four aggravators for the murder of Sheila Burage: (1) that the defendant knowingly created a great risk of death to many persons, (2) that the offense was committed while the defendant engaged in the commission of the crime of burglary, (3) that the offense was committed while the defendant was engaged in the flight after committing kidnapping and robbery and (4) that the offense was especially heinous, atrocious or cruel. The jury found all four aggravating circumstances beyond a reasonable doubt.

¶150. Because this Court has upheld the death penalty in similar instances and because the jury found numerous aggravating circumstances for each capital murder conviction, no disproportionality exists in this case.

### XX. Cumulative Error

¶151. Godbolt argues that cumulative error necessitates the reversal of his convictions and sentences. "This Court may reverse a conviction and/or sentence based upon the cumulative effect of errors that do not independently require reversal." **Keller**, 138 So. 3d at 876-77 (quoting **Manning v. State**, 884 So. 2d 717, 730 (Miss. 2004)). "It is true that in capital cases, although no error, standing alone, requires reversal, the aggregate effect of various errors may create an atmosphere of bias, passion and prejudice that they effectively deny the

defendant a fundamentally fair trial." *Id.* (internal quotation marks omitted) (quoting *Manning*, 884 So. 2d at 730). Having found no error, Godbolt's sentences and convictions are affirmed.

**CONCLUSION**

¶152. For the foregoing reasons, this Court affirms Godbolt's convictions and sentences.

¶153. **AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, MAXWELL, BEAM, ISHEE AND GRIFFIS, JJ., CONCUR. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶154. Willie Godbolt was deprived of the constitutional right to a fair and impartial jury. Accordingly, the law requires us to reverse his convictions and sentences and remand the case for a new trial. I consequently dissent.

¶155. "The right to a fair trial by an impartial jury is fundamental and essential to our form of government." *Hyundai Motor Am. v. Applewhite*, 319 So. 3d 987, 1002 (Miss. 2021) (internal quotation marks omitted) (quoting *Johnson v. State*, 476 So. 2d 1195, 1209 (Miss. 1985)). "To preserve this fundamental right, courts must stand guard and be vigilant against even the appearance of impropriety, much less actual impropriety, in trial proceedings[.]" *Id.* In *Applewhite*, this Court fervently defended the right of a civil defendant to an impartial jury, but the right of a criminal defendant to an *impartial* jury is even more inviolate, as that right is enshrined in our constitution. *Id.*; Miss. Const. art. 3, § 26 ("In all criminal prosecutions the accused shall have the right to . . . a speedy and public trial by an impartial

66

jury . . . .").

¶156. Godbolt argues that his right to an impartial jury was deprived by the quantity of law-enforcement-related jurors in his venire and on his jury. He cites *Mhoon v. State* as authority that such composition violates his constitutional right to an impartial jury. *Mhoon v. State*, 464 So. 2d 77 (Miss. 1985), *superseded by statute on other grounds as stated in* *Flowers v. State*, 158 So. 3d 1009, 1061 (Miss. 2014). The majority dismisses this challenge by noting that the jurors at issue stated that they could be fair and impartial, that Godbolt's jury contained "only" four law enforcement related jurors, and that no juror was a police officer. Maj. Op. ¶ 94. This dismissal ignores several key similarities between *Mhoon* and this case, however, and ignores the ways in which Godbolt's case is more problematic than *Mhoon*. Furthermore, the jurors in *Mhoon* also gave the oath of impartiality, but this Court still found that the problems with the jury pool and jury trumped the oath. *Mhoon*, 464 So. 2d at 80.

¶157. As the majority notes, the thirty-nine person venire in *Mhoon*, after strikes for cause, consisted of twelve jurors with law enforcement connections. *Id.* So, approximately 30.8 percent of the venire consisted of potential jurors with law-enforcement connections. In Godbolt's case, the forty-five person venire after strikes for cause consisted of fourteen jurors with law-enforcement connections, or approximately 31.1 percent. In *Mhoon*, the Court noted, and the majority today ignores, that the sheer number of law-enforcement-connected venirepersons was highly problematic. *Id.* The Court categorized the venire pool as containing an "inordinate abundance of law enforcement persons and their relatives." *Id.* It noted that "[t]he statistical probability of this situation seems somewhat remote." *Id.* The

67

Court went on to explain that

> The unlikelihood of this situation occurring is supported by the fact that there are no cases in Mississippi holding explicitly one way or the other as to whether policemen or blood/marriage relations of current or former police officers can be excused for cause. It would appear that the reason this issue has never surfaced previously is that in a normal jury pool—containing a couple of police-related persons—defense counsel simply exercises some of his peremptory challenges and the problem disappears. In this case, Mhoon's counsel would have had to use every single one of his peremptory challenges just to exclude all the persons connected with the police force.

*Id.* The Court held that "the sheer number of law enforcement-connected persons in the jury pool, as well as persons selected as jurors, has worked a great hardship on Mhoon. Given the statistical aberation in the jury pool, the judge could have done several things to ameliorate its prejudicial effect[.]" *Id.* at 81. The Court opined that the trial judge could have granted the defendant additional peremptory strikes, increased the size of the venire, or sustained some of the challenges for cause. *Id.*

¶158. The statistical aberation of an inordinate amount of venirepersons being law-enforcement connected was enough in *Mhoon* for this Court to find that the trial judge should have taken preventative measures. *Id.* In Godbolt's case, the jury pool had an even higher number and a higher percentage of law enforcement connected venirepersons. The majority attempts to differentiate the venire in *Mhoon* by noting that twelve venire persons were related by blood or marriage to current or former law enforcement or were law enforcement themselves, and then implies that most of Godbolt's venire had "more attenuated" connections. Maj. Op. ¶ 94. It is noteworthy that the same number, twelve, in Godbolt's venire were related to people currently or formerly in law enforcement. Only two

68

had claims that may arguably be "more attenuated" than that. While the Court in **Mhoon** noted as problematic that Mhoon would have had to use all of his peremptory strikes to rid the venire of law-enforcement-connected persons, in Godbolt's case, even if he used every peremptory strike, he could not have cleared the venire of law-enforcement-connected persons. Thus, the jury pool in this case is even more problematic than that in **Mhoon**, and the trial judge certainly should have utilized some or all of the suggested remedies listed by this Court in **Mhoon**.[8]

¶159. The majority distinguishes this case by pointing out that in **Mhoon**, the ultimate jury contained six law-enforcement-connected jurors, including a current police officer as the foreman, while Godbolt "only" had four law-enforcement-connected jurors and no current law enforcement officers. Maj. Op. ¶ 94. But Godbolt's jury was still composed of 33.3 percent law-enforcement-connected jurors—a percentage even higher than the statistical anomaly and problematic percentage found within the jury venire in **Mhoon**. If 30 percent of the jury venire being law enforcement connected is highly problematic constitutionally, then it is difficult to argue that 33.3 percent of the jury itself being law-enforcement

---

[8]Furthermore, the State policy is that "all persons selected for jury service be selected at random from a fair cross section of the population of the area served by the court[.]" Miss. Code Ann. § 13-5-2 (Rev. 2019). This Court has found that because this policy being followed is of such public interest, it will address it even when the issue is moot. **Hyundai Motor Am. v. Hutton**, 328 So. 3d 592, 608 (Miss. 2021). Indeed, "[s]election of a jury from a representative cross-section of the community is an essential component of" the right to be tried by a fair and impartial jury. **Id.** (quoting **Adams v. State**, 537 So. 2d 891, 893 (Miss. 1989)). This Court has previously indicated that excusing people from jury service when it results in skewed representation of distinctive groups is problematic. **Hutton**, 328 So. 3d at 609. Certainly, in a criminal case, a jury pool with a skewed number of law-enforcement-related potential jurors also flies in the face of the right to a jury pool that is composed of a representative cross-section of the community.

connected is not constitutionally significant. Further, while no current law enforcement served on Godbolt's jury, two of the victims in this case were law enforcement, whereas the victims in *Mhoon* were not law enforcement. This is an important distinction, because sympathy for law enforcement is one reason a defendant may not want law enforcement on the jury—in this case, it was not only due to law-enforcement witnesses, but also because sympathy might be additionally heightened by the fact that two victims were law-enforcement personnel. These additional factors put Godbolt's case at least on par with *Mhoon*, if not making it even more problematic. Like in *Mhoon*, with an unusually high percentage of law-enforcement-connected persons in the venire, with four law enforcement related jurors on a jury of twelve, and with two victims being law enforcement, "the opportunity for undue influence over the opinions of other jurors was too great a risk." *Mhoon*, 464 So. 2d at 82. Like in *Mhoon*, "under this novel situation the coercive influence on the jury precludes [a conclusion] . . . that this appellant was afforded his constitutional right of a trial by an impartial jury . . . ." *Id.*

¶160. Because Godbolt was deprived of his right to an impartial jury, "due process of law guaranteed by our Constitution under Art. 3, § 14 requires a retrial." *Id.* I recognize in this case there exists highly probative evidence of guilt. However, when the constitutional guarantee of trial by an impartial jury is violated, "[t]here is no such thing in our law as 'harmless error[.]'" *Jones v. State*, 97 Miss. 269, 52 So. 791, 793 (1910). Therefore, the case must be reversed and remanded—highly probative evidence of guilt notwithstanding, only an impartial jury may determine that such evidence proves beyond a reasonable doubt that

Godbolt committed the crimes of which he is accused.

**KITCHENS, P.J., JOINS THIS OPINION.**

# APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Tony Terrell Clark v. State*, 343 So. 3d 943 (Miss. 2022).

*Alberto Julio Garcia v. State*, 300 So. 3d 945 (Miss. 2020).

*Abdur Rahim Ambrose v. State*, 254 So. 3d 77 (Miss. 2018).

*Curtis Giovanni Flowers v. State*, 240 So. 3d 1082 (Miss. 2017), *rev'd and remanded*, 139 S. Ct. 2228, 204 L. Ed. 2d 638 (2019).

*Timothy Nelson Evans v. State*, 226 So. 3d 1 (Miss. 2017).

*James Cobb Hutto III v. State*, 227 So. 3d 963 (Miss. 2017).

*David Cox v. State*, 183 So. 3d 36 (Miss. 2015).

*David Dickerson v. State*, 175 So. 3d 8 (Miss. 2015).

*Timothy Robert Ronk v. State*, 172 So. 3d 1112 (Miss. 2015).

*Curtis Giovanni Flowers v. State*, 158 So. 3d 1009 (Miss. 2014), *vacated*, 136 S. Ct. 2157, 195 L. Ed. 2d 817 (2016).

*Caleb Corrothers v. State*, 148 So. 3d 278 (Miss. 2014), *leave to seek PCR granted in part and denied in part*, 255 So. 3d 99 (Miss. 2017).

*Jason Lee Keller v. State*, 138 So. 3d 817 (Miss. 2014), *leave to seek PCR granted in part and denied in part*, 229 So. 3d 715 (Miss. 2017).

*Leslie Galloway III v. State*, 122 So. 3d 614 (Miss. 2013).

*Bobby Batiste v. State*, 121 So. 3d 808 (Miss. 2013), *leave to seek PCR granted*, 184 So. 3d 290 (Miss. 2016).

*Roger Lee Gillett v. State*, 56 So. 3d 469 (Miss. 2010).

*Moffett v. State*, 49 So. 3d 1073 (Miss. 2010).

*Pitchford v. State*, 45 So. 3d 216 (Miss. 2010).

*Goff v. State*, 14 So. 3d 625 (Miss. 2009).

*Wilson v. State*, 21 So. 3d 572 (Miss. 2009).

*Chamberlin v. State*, 989 So. 2d 320 (Miss. 2008).

*Loden v. State*, 971 So. 2d 548 (Miss. 2007).

*King v. State*, 960 So. 2d 413 (Miss. 2007).

*Bennett v. State*, 933 So. 2d 930 (Miss. 2006).

*Havard v. State*, 928 So. 2d 771 (Miss. 2006).

*Spicer v. State*, 921 So. 2d 292 (Miss. 2006).

*Hodges v. State*, 912 So. 2d 730 (Miss. 2005).

*Walker v. State*, 913 So. 2d 198 (Miss. 2005).

*Le v. State*, 913 So. 2d 913 (Miss. 2005), *leave to seek PCR denied*, 967 So. 2d 627 (Miss. 2007), *leave to seek second PCR granted*, 2013-DR-00327-SCT (Miss. Jan. 26, 2016).

*Brown v. State*, 890 So. 2d 901 (Miss. 2004).

*Powers v. State*, 883 So. 2d 20 (Miss. 2004)

*Branch v. State*, 882 So. 2d 36 (Miss. 2004).

*Scott v. State*, 878 So. 2d 933 (Miss. 2004).

*Lynch v. State*, 877 So. 2d 1254 (Miss. 2004).

*Dycus v. State*, 875 So. 2d 140 (Miss. 2004).

*Byrom v. State*, 863 So. 2d 836 (Miss. 2003).

*Howell v. State*, 860 So. 2d 704 (Miss. 2003).

*Howard v. State*, 853 So. 2d 781 (Miss. 2003).

*Walker v. State*, 815 So. 2d 1209 (Miss. 2002). *following remand.

*Bishop v. State*, 812 So. 2d 934 (Miss. 2002).

*Stevens v. State*, 806 So. 2d 1031 (Miss. 2002).

*Grayson v. State*, 806 So. 2d 241 (Miss. 2002).

*Knox v. State*, 805 So. 2d 527 (Miss. 2002).

*Simmons v. State*, 805 So. 2d 452 (Miss. 2002).

*Berry v. State*, 802 So. 2d 1033 (Miss. 2001).

*Snow v. State*, 800 So. 2d 472 (Miss. 2001).

*Mitchell v. State*, 792 So. 2d 192 (Miss. 2001).

*Puckett v. State*, 788 So. 2d 752 (Miss. 2001). * following remand.

*Goodin v. State*, 787 So. 2d 639 (Miss. 2001).

*Jordan v. State*, 786 So. 2d 987 (Miss. 2001).

*Manning v. State*, 765 So. 2d 516 (Miss. 2000). *following remand.

*Eskridge v. State*, 765 So. 2d 508 (Miss. 2000).

*McGilberry v. State*, 741 So. 2d 894 (Miss. 1999).

*Puckett v. State*, 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State*, 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State*, 735 So. 2d 238 (Miss. 1999).

*Turner v. State*, 732 So. 2d 937 (Miss. 1999).

*Smith v. State*, 729 So. 2d 1191 (Miss. 1998).

*Burns v. State*, 729 So. 2d 203 (Miss. 1998).

*Jordan v. State*, 728 So. 2d 1088 (Miss. 1998).

*Gray v. State*, 728 So. 2d 36 (Miss. 1998).

*Manning v. State*, 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State*, 726 So. 2d 524 (Miss. 1997).

*Bell v. State*, 725 So. 2d 836 (Miss. 1998), *post-conviction relief granted in part and denied in part*, 725 So. 2d 836 (Miss. 2011).

*Evans v. State*, 725 So. 2d 613 (Miss. 1997).

*Brewer v. State*, 725 So. 2d 106 (Miss. 1998).

*Crawford v. State*, 716 So. 2d 1028 (Miss. 1998).

*Doss v. State*, 709 So. 2d 369 (Miss. 1996).

*Underwood v. State*, 708 So. 2d 18 (Miss. 1998).

*Holland v. State*, 705 So. 2d 307 (Miss. 1997).

*Wells v. State*, 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State*, 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State*, 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State*, 684 So. 2d 1179 (Miss. 1996).

*Davis v. State*, 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581 (Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989); *Shell v. Mississippi*, 498 U.S. 1 (1990) (reversing, in part, and remanding); *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) (remanding for new sentencing hearing).

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989); *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) (vacating and remanding); *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) (remanding for new sentencing hearing).

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988); *Clemons v. Mississippi*, 494 U.S. 738 (1990) (vacating and remanding); *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) (remanding for new sentencing hearing).

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987); *Jones v. Mississippi*, 487 U.S. 1230 (1988) (vacating and remanding); *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) (remanding for new sentencing hearing).

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

*Case was originally affirmed in this Court but on remand from United States Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCING PHASE

*Curtis Giovanni Flowers v. State*, 287 So. 3d 905 (Miss. 2019), *on remand from* 139 S. Ct. 2228, 204 L. Ed. 2d 638 (2019).

*Justin Barrett Blakeney v. State*, 236 So. 3d 11 (Miss. 2017).

*Sherwood Brown v. State*, 2017-DR-00206-SCT (Miss. Oct. 26, 2017) (order granting post-conviction relief and vacating underlying convictions and sentences and remanding to the DeSoto County Circuit Court for a new trial).

*Erik Wayne Hollie v. State*, 174 So. 3d 824 (Miss. 2015).

*Manning v. State*, 158 So. 3d 302 (Miss. 2015) (reversing denial of post-conviction relief).

*Byrom v. State*, 2014-DR-00230-SCT (Miss. April 3, 2014) (order).

*Ross v. State*, 954 So. 2d 968 (Miss. 2007).

*Flowers v. State*, 947 So. 2d 910 (Miss. 2006).

*Flowers v. State*, 842 So. 2d 531 (Miss. 2003).

*Randall v. State*, 806 So. 2d 185 (Miss. 2002).

*Flowers v. State*, 773 So. 2d 309 (Miss. 2000).

*Edwards v. State*, 737 So. 2d 275 (Miss. 1999).

*Smith v. State*, 733 So. 2d 793 (Miss. 1999).

*Porter v. State*, 732 So. 2d 899 (Miss. 1999).

*Kolberg v. State*, 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State*, 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State*, 702 So. 2d 388 (Miss. 1997).

*Howard v. State*, 701 So. 2d 274 (Miss. 1997).

*Lester v. State*, 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State*, 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*,  531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

# DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
## FOR RESENTENCING TO LIFE IMPRISONMENT

*Bell v. State*, 160 So. 3d 188 (Miss. 2016).

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY

*Fulgham v. State*, 46 So. 3d 315 (Miss. 2010).

*Rubenstein v. State*, 941 So. 2d 735 (Miss. 2006).

*King v. State*,  784 So. 2d 884 (Miss. 2001).

*Walker v. State*, 740 So. 2d 873 (Miss. 1999).

*Watts v. State*, 733 So. 2d 214 (Miss. 1999).

*West v. State*, 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State*, 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989); *Shell v. Mississippi*, 498 U.S. 1 (1990) (reversing, in part, and remanding); *Shell v. State* 595 So. 2d 1323 (Miss. 1992) (remanding for new sentencing hearing).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989); *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) (vacating and remanding); *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) (remanding for new sentencing hearing).

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988); *Clemons v. Mississippi*, 494 U.S. 738 (1990) (vacating and remanding); *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) (remanding for new sentencing hearing).

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987); *Jones v. Mississippi,* 487 U.S. 1230 (1988) (vacating and remanding); *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) (remanding for new sentencing hearing).

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989), *sentence aff'd*, 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984), *aff'd*, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied*, 479 U.S. 1036 (1988), *resentencing ordered*, 635 So. 2d 802 (Miss. 1993), *following writ of habeas corpus issued sub nom. Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992), *resentencing affirmed*, 691 So. 2d 959 (Miss. 1997).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984) (case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing).